[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-13618

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2010
JOHN LEY
CLERK

D. C. Docket No. 09-21610-CV-PAS

ESTATE OF AHUVA AMERGI,
by and through RAFI AMERGI as
Administrator, Executor and/or
Personal Representative,
RAFI AMERGI, et al.,

Plaintiffs-Appellants,

versus

THE PALESTINIAN AUTHORITY,
THE PALESTINE LIBERATION ORGANIZATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 27, 2010)

Before BIRCH, MARCUS and BALDOCK,* Circuit Judges.

MARCUS, Circuit Judge:

_____

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Plaintiffs Rafi Amergi, Dan Davidovic, Judith Davidovic, Eliezer Davidovic, Ariel Davidovic, Sarah Zweig, and the Estate of Ahuva Amergi (collectively, "the Amergis") appeal the dismissal of their complaint against defendants the Palestinian Authority ("PA") and the Palestine Liberation Organization ("PLO") for lack of subject matter jurisdiction. The suit arises from the murder of Ahuva Amergi, an Israeli citizen who was shot and killed as she drove her car in the Gaza Strip in February of 2002. The Amergis claim that Ahuva Amergi was killed in the course of an armed conflict between the defendants and the people and state of Israel, and that the district court therefore had subject matter jurisdiction over the suit pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS").

The federal courts of the United States are permitted to recognize a limited set of causes of action for international wrongs under the ATS. Their ability to do so, however, is sharply circumscribed, both by precedent and by prudence. The Amergis urge this Court to recognize their claim under the ATS, but because the act they allege -- a single killing by non-state actors purportedly in the course of an armed conflict -- fails to meet the Alien Tort Statute's high bar, we hold that the district court properly dismissed their ATS claim for lack of subject matter jurisdiction. We also hold that the district court did not abuse its discretion in

2

declining to exercise supplemental jurisdiction over a common law wrongful death claim, or in severing the Amergis' claims from that of Moshe Saperstein, a co-plaintiff proceeding under the Federal Terrorism Act, 18 U.S.C. § 2333 ("FTA"). Accordingly, we affirm.

I.

A.

The operative complaint in this case -- the Third Amended Complaint -- alleges the following basic facts, which we accept as true for the purposes of this appeal. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009). In early 2002, defendant the Palestinian Authority ("PA") exercised control over territories in the Gaza Strip and in the Judea and Samaria regions of the West Bank. The PA itself was effectively controlled by defendant the Palestine Liberation Organization ("PLO"). Both organizations, in turn, were controlled by defendant Yasser Arafat, who was then the president of the PA and chairman of the PLO. The Al Aksa Brigades were an official law enforcement and intelligence arm of the PA.

According to the complaint, the PA, the PLO, and Arafat "advocated, encouraged, solicited, facilitated, incited, sponsored, organized, planned and executed acts of violence and terrorism against Jewish civilians in Israel, Gaza and

3

the Judea and Samaria regions of the West Bank." The United States and Israel directed the PA, the PLO, and Arafat to take steps to prevent further terrorist activity, but the defendants refused. In fact, the PA, the PLO, and Arafat encouraged terrorism by giving money to the families of Al Aksa Brigades members who were killed or captured while engaging in terrorist acts against Israel.

Defendant Yaser Mahmud Alkativ was a commander of the Palestinian General Intelligence Services and the Al Aksa Brigades. Alkativ's responsibilities included recruitment for the PA, the PLO, Arafat, and defendant the Palestinian Preventative Security Services ("PPSS"), and purchasing arms on their behalf for use in terrorist attacks against Israel. Defendant Nizhar D'Hliz was also a member of the Al Aksa Brigades, and bought arms for the organizations at the direction of Alkativ.

One day in early February 2002, Alkativ informed D'Hliz that he had recruited Muhamad Al Katzir, a young man who was interested in committing acts of terrorism against Israelis. Alkativ instructed D'Hliz to train Katzir, which he did. Katzir had completed his training by mid-February, and proceeded to attend a meeting with several members of the Al Aksa Brigades. Defendant Naim Mutzran, also a convicted terrorist, was present. At this meeting, Katzir executed his last

will and testament and recorded a video (filmed by Alkativ) in which he described the terrorist acts he was about to commit.

On February 18, 2002, Katzir traveled to the Netzarim road near Kisufim, Israel. He was armed with an AK-47 machine gun and at least one hand grenade, and he had an explosive device strapped to his body. Driving on the road that day was plaintiff Moshe Saperstein, a dual U.S. and Israeli citizen. Saperstein was a veteran of the Yom Kippur War of October 1973, during which he lost his right hand and eye. Driving in another vehicle was Ahuva Amergi, an Israeli citizen and lawyer. She was the wife of plaintiff Rafi Amergi and mother of four year old plaintiff Itzhak Amergi and three year old plaintiff Efraim Amergi.

As their vehicles drove by, Katzir opened fire on both, spraying bullets at the cars driven by Saperstein and Amergi. Amergi was killed, but Saperstein was only wounded, shot in the left hand. Saperstein managed to strike Katzir with his car, but Katzir escaped serious injury from the blow. Meanwhile, a battalion of soldiers from the Israel Defense Forces up the road heard the shots and responded. Two Israeli soldiers were killed while coming to the aid of Amergi, but others were able to engage Katzir. Katzir died during the firefight, from the detonation of either his own hand grenade or the explosives which were strapped to his body.

D'Hliz and Mutzran were both captured and convicted in connection with

5

the Amergi murder; they are now serving 36 and 33 years, respectively, in Israeli prison.

## B.

We explicate the complex procedural history of this case in some detail in order to address the issues raised by the appeal. On January 29, 2004, Saperstein and the Estate of Ahuva Amergi sued the PA, the PLO, the PPSS, Arafat,[1] and Alkativ in the United States District Court for the Southern District of Florida. Saperstein sued under the Federal Terrorism Act, 18 U.S.C. § 2333 ("FTA"), while the Estate sued under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). The plaintiffs sought over $20 million in damages. Two amended complaints followed.[2] When the defendants did not satisfactorily respond to the Second Amended Complaint, the district court granted a default judgment to Saperstein on

---

[1] Arafat died on November 11, 2004. Shortly thereafter, the plaintiffs moved to substitute Mahmoud Abbas, his replacement at the PA, and the Estate of Arafat as defendants. The district court granted the motion on March 23, 2005.

[2] The amended complaints added a number of parties, including the families of Amergi and Saperstein as plaintiffs, and D'Hliz and Mutzran as defendants. However, all plaintiffs later served notice on the district court of their voluntary dismissal of the Palestinian Preventative Security Services and all of the individual defendants (Abbas, Alkativ, D'Hliz, Mutzran, and the Estate of Arafat) from the action. The district court also dismissed the Saperstein family from the action. Saperstein v. Palestinian Auth., No. 04-cv-20225-PAS, 2006 WL 3804718, *9 (S.D. Fla. Dec. 22, 2006). The only remaining parties in the case are Saperstein and the Amergis as plaintiffs and the PA and the PLO as defendants.

6

his FTA claim, but declined to enter default for the Amergis on their ATS claim.[3]

The court scheduled the Saperstein case for trial on damages, and granted the

Amergis leave to file a third amended complaint.

The Third Amended Complaint contained three counts: (1) Saperstein's

Federal Terrorism Act claim,[4] (2) the Amergis' Alien Tort Statute claim, and (3) a

common law wrongful death claim brought by the Amergis.  Third Amended

Complaint at 8-13, Saperstein v. Palestinian Auth., No. 04-20225-CIV-

SEITZ/BANDSTRA (S.D. Fla. Aug. 11, 2006) ("Third Amended Complaint").

Soon thereafter, the defendants moved to dismiss counts two and three of the Third

Amended Complaint, and on December 22, 2006, the district court, in an extensive

order, granted the motion.  Saperstein v. Palestinian Auth., No. 04-cv-20225-PAS,

2006 WL 3804718 (S.D. Fla. Dec. 22, 2006).

In determining whether the conduct alleged by the Amergis was actionable

under the ATS, the district court first explained that the complaint was pled

---

[3] The defendants had moved to dismiss the Second Amended Complaint, but their motion was stricken by the district court because the attorneys who filed it had not been admitted to the district court.  The defendants did not respond, and the clerk entered default.  The court then granted the defense application for its lawyers to appear pro hac vice, but denied the defense's subsequent motions to set aside the entry of default and to resubmit its motion to dismiss.  The district court also denied the plaintiffs' motion for a default judgment.  The plaintiffs renewed their motion for default judgment, which the district court ultimately granted as to Saperstein but denied as to the Amergis.

[4] The court had never given leave to Saperstein to join in the Third Amended Complaint, and accordingly later struck count one of the Third Amended Complaint.  Saperstein v. Palestinian Auth., No. 04-20225-CIV, 2008 WL 4467535, *17 (S.D. Fla. Sept. 29, 2008).

primarily as a terrorism case. Id. at *2-3, 7. The court ruled that acts of terrorism were not cognizable under the ATS and, therefore, it had no subject matter jurisdiction pursuant to a terrorism theory. Id. at *6, 7. Moving next to the Amergis' theory that the killing violated the Geneva Conventions on the law of war and was cognizable under the Alien Tort Statute as a war crime, the court observed that not every violation of the Geneva Conventions supports ATS jurisdiction. Id. at *8. Moreover, the district court concluded, extending the ATS to cover this act, or any violation of the Geneva Conventions, would dramatically expand federal jurisdiction, in violation of the Supreme Court's direction in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004). See Saperstein, 2006 WL 3804718, at *8. It therefore dismissed the ATS count. Id. Having disposed of the Amergis' ATS claim, the district court elected not to exercise supplemental jurisdiction over their wrongful death count. Id. at *9; see also 28 U.S.C. § 1367(c)(4).

In the meantime, the Saperstein case continued on its own. After a jury trial in February of 2007, a magistrate judge entered judgment for Saperstein in the amount of $48 million. An appeal followed, but because the district court never adopted or approved of the magistrate judge's final judgment for Saperstein, and the parties never consented to the final judgment, we determined that the judgment was not binding. Saperstein v. Palestinian Auth., No. 07-11560-CC (11th Cir. July

8

18, 2007); <u>Saperstein v. Palestinian Auth.</u>, No. 07-11313-CC (11th Cir. Oct. 17, 2007); <u>see also</u> 28 U.S.C. § 636(c).

The case went back to the district court where, on September 29, 2008, the trial court elected to sever the Amergis' case from Saperstein's case. <u>Saperstein v. Palestinian Auth.</u>, No. 04-20225-CIV, 2008 WL 4467535, *17 (S.D. Fla. Sept. 29, 2008). The district court also conditionally granted the Defendants' Motion to Vacate Default. <u>Id.</u> The Saperstein family and the Amergis (but not Saperstein himself) moved for reconsideration, but on June 11, 2009, the district court denied the motion. Final judgment was entered for the defendants and against the Amergis and the Saperstein family on June 16, 2009. Saperstein's case continues under another case number, and is not now before this panel.

The Amergis timely appealed.

II.

"A district court's decision to grant a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is a question of law we review <u>de novo</u>." <u>Sinaltrainal v. Coca-Cola Co.</u>, 578 F.3d 1252, 1260 (11th Cir. 2009) (citing <u>McElmurray v. Consol. Gov't of Augusta-Richmond County</u>, 501 F.3d 1244, 1250 (11th Cir. 2007)). We review for an abuse of discretion the decision of a district court to decline to exercise supplemental jurisdiction. <u>Shotz v. City of Plantation,</u>

9

Fla., 344 F.3d 1161, 1185 (11th Cir. 2003).  We also review for an abuse of discretion the decision of a district court to sever a case pursuant to Fed. R. Civ. P. 21.  See Bailey v. Bd. of County Comm'rs of Alachua County, Fla., 956 F.2d 1112, 1127-28 (11th Cir. 1992).

## III.

### A.

The Alien Tort Statute[5] was initially passed at the beginning of the Republic in 1789, and with only "minor amendments since that time," Sinaltrainal, 578 F.3d at 1261, today provides federal jurisdiction over a limited class of international wrongs: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  "Federal subject matter jurisdiction exists for an ATS claim when . . . three elements are satisfied: (1) an alien (2) sues for a tort (3) committed in violation of the law of nations."  Sinaltrainal, 578 F.3d at 1261.  While the text of the statute itself makes reference only to jurisdiction, see Sosa v. Alvarez-Machain, 542 U.S. 692, 712 (2004) ("[T]he statute is in terms only jurisdictional."); Sinaltrainal, 578 F.3d at 1262, it is by now abundantly clear that

---

[5] "The statute is also known as the Alien Tort Claims Act (ATCA), and the Alien Tort Act (ATA)."  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1257 n.1 (11th Cir. 2009) (citations omitted).

the statute "confers both a forum and a private right of action to aliens alleging a violation of international law," Abebe-Jira v. Negewo, 72 F.3d 844, 848 (11th Cir. 1996); see also Sosa, 542 U.S. at 714.

The Supreme Court definitively addressed the scope of the ATS recently in Sosa. In giving content to the statute's enigmatic language, the Court cited evidence that "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations." Sosa, 542 U.S. at 720. To determine which violations Congress had in mind, the Supreme Court looked to Blackstone's Commentaries, which disclosed three relevant violations: "offenses against ambassadors, violations of safe conduct . . . and piracy." Id. What these three torts had in common was that they all fell within the "sphere in which the[] rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships," and that each, if unredressed, "threaten[ed] serious consequences in international affairs." Id. at 715. These violations of international law, the Supreme Court has instructed, were actionable under the ATS and remain so today.

Nonetheless, in deference to two centuries of continued development in international law, Sosa observed that federal courts may also recognize torts beyond the paradigmatic three contemplated by the first Congress. Id. at 724-25.

11

Yet they must do so only with great parsimony. Expansion of the ATS is strictly limited to acts that violate "a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" that the Supreme Court recognized in Sosa. Id. at 725.

Because of Sosa's deliberate approach, and the Supreme Court's admonition that only a limited band of cases may fall within the ambit of the statute, we proceed in this arena with "great caution when considering new causes of action," and we open the door to only "a narrow class of international norms recognized today." Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1246-47 (11th Cir. 2005) (quotation marks, alterations, and citations omitted). Several specific characteristics may suggest that a norm falls within the narrow sphere of the ATS. For one, the existence of a treaty reflecting an overwhelming international consensus on certain norms may be evidence of the specificity and international scope of concern required by the ATS. See Kadic v. Karadzic, 70 F.3d 232, 241-42 (2d Cir. 1995). Moreover, state action, or complicity therewith, may also be a powerful indicia of a violation that "is sufficiently definite to support a cause of action" under the ATS. Sosa, 542 U.S. at 732-33; see also id. at 732 n.20. Compare Sinaltrainal, 578 F.3d at 1265 ("ATS claims generally require allegations of state action because the law of nations are the rules of conduct that

12

govern the affairs of a nation, acting in its national capacity, in relations with another nation."), with Romero v. Drummond Co., Inc., 552 F.3d 1303, 1316 (11th Cir. 2008) ("[I]ndividuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation.").

As the Supreme Court recognized in Sosa, a federal court's assessment of whether an alleged wrong is actionable under the ATS is also bound up with the court's important gatekeeping function. "[T]he determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." Sosa, 542 U.S. at 732-33 (footnotes omitted). Thus, "the judicial power to recognize new law of nations violations 'should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping.'" Sinaltrainal, 578 F.3d at 1263 (quoting Sosa, 542 U.S. at 729) (emphasis in Sinaltrainal).

B.

Against this legal backdrop, we examine the legal theories and facts offered by the Amergis in support of subject matter jurisdiction. But before doing so, we begin with what the Amergis have neither propounded as a legal theory nor

13

presented as facts to the district court. For one thing, the Amergis asserted, for the first time during oral argument, that the actions of the defendants amounted to attempted genocide. Notably, however, they did not make in their complaint or in any of their other pleadings any sort of genocide argument, or any claim of ethnic cleansing, or any assertion that a group of Israelis, or Jews, had been targeted for removal or relocation. Nor have they presented any facts in support of this new claim.

In addition, the Amergis have not asserted that there was any state action involved in the single act of alleged murder. Moreover, they have not claimed torture, nor summary execution, nor multiple killings, nor multiple acts of rape, nor any other distinct war crimes. We cannot reach out and consider claims raised for the first time at oral argument, and notably without any factual foundation or even the barest averment in any complaint. See Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1542 (11th Cir. 1994).

We turn, then, to the two legal theories on which the Amergis have traveled in this case. The first, which is embodied in the Third Amended Complaint, essentially propounds a terrorism theory. This theory posits that the district court had jurisdiction under the Alien Tort Statute over the acts alleged because they were "acts of international terrorism, as defined in federal law." The district court

14

rejected this theory, Saperstein v. Palestinian Auth., No. 04-cv-20225-PAS, 2006 WL 3804718, at *7 & nn.13-15 (S.D. Fla. Dec. 22, 2006), and because the Amergis do not challenge this legal determination on appeal, we have no occasion to review it today. See Allstate Ins., 27 F.3d at 1542.

The Amergis' second and only remaining legal theory is that a killing by private actors in the course of an armed conflict is enough to give rise to subject matter jurisdiction under the ATS, at least under the facts of this case. Again, while they concede that there is no state action, they argue nevertheless that the murder of Ahuva Amergi by the PA and the PLO is sufficiently egregious to constitute a war crime, thus conferring jurisdiction under the statute. They argued this point before the district court, and the district court squarely rejected this theory. Saperstein, 2006 WL 3804718, at *8. The Amergis now reassert only the second theory before this Court. The defendants maintain, however, that even a private killing in the course of an armed conflict cannot support subject matter jurisdiction under the ATS.

The first problem that the Amergis face in this appeal is that the pleadings and the record do not evince any support for the theory that the single killing occurred during the course of an armed conflict. There is virtually nothing in the

15

Third Amended Complaint that pleads the existence of an ongoing armed conflict.[6]

The Third Amended Complaint does not explain whether the conflict was a war, how long it had gone on, who was fighting, what they were fighting for, how the conflict had evolved, or how the tort at issue fit into the larger picture. Quite simply, the Third Amended Complaint fails to establish subject matter jurisdiction under the ATS. See Sinaltrainal, 578 F.3d at 1265; see also Aldana, 416 F.3d at 1247 (noting that the description of a background conflict was "too tenuous to establish a prima facie case, especially in the light of Sosa's demand for vigilant doorkeeping"). While the Amergis suggest that we may look to facts extrinsic to the complaint to support subject matter jurisdiction, see, e.g., In re CP Ships Ltd. Sec. Litig., 578 F.3d 1306, 1311-12 (11th Cir. 2009) (explaining the difference

---

[6] The complaint four times describes the activities that proceeded the Amergi killing. First, it alleges that arms purchased for the defendants by Alkativ "were used by young Palestinian operatives for acts of terror against Israel and its inhabitants." Third Amended Complaint ¶ 4. Second, the complaint says that the defendants "advocated, encouraged, solicited, facilitated, incited, sponsored, organized, planned and executed acts of violence and terrorism against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank." Id. ¶ 6. Third, the defendants are alleged to have

> granted financial support to the families of members of the Al Aksa Brigades who had been captured or killed while carrying out acts of terrorist violence against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank, thereby providing the Al Aksa Brigades and its members with strong financial incentive to continue to carry out violence and terrorism against such victims.

Id. ¶ 9. Fourth, and finally, the defendants are alleged to have "continuously advocated, encouraged, solicited, facilitated and incited the use of violence and terrorism against Jewish civilians in Israel, Gaza and the Judea and Samaria regions of the West Bank." Id. ¶ 11. These scattered passages give little sense of the nature of any controversy.

between facial and factual challenges to subject matter jurisdiction),[7] abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., --- S. Ct. ---, 2010 WL 2518523 (June 24, 2010), the problem here is that the record is completely barren of any facts in support of the Amergis' second legal theory.

Apparently recognizing the insufficiency of their complaint and the empty evidentiary record, the Amergis urge us to consider as extrinsic facts in support of their theory a series of concessions made by the defense before the district court. See, e.g., Defendants Memorandum of Law in Support of Their Motion Pursuant to Fed. R. Civ. P. 12(b) To Dismiss The Second Amended Complaint at 3, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/BANDSTRA (S.D. Fla. July 13, 2004)[8] (describing in some detail their view of "the intense ongoing armed conflict

_____

[7] The record in this case reveals that the defendants have mounted a factual attack. See Defendants' Memorandum of Law in Support of Their Motion Pursuant to Fed. R. Civ. P. 12(b) To Dismiss The Second Amended Complaint at 3, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/BANDSTRA (S.D. Fla. July 13, 2004) (asking the district court to consider "matters outside the pleadings . . . for their bearing on plaintiffs['] claims of subject matter jurisdiction which defendants dispute on factual and legal grounds."); id. (describing their view of "the belligerent occupation of the Palestinian territories by Israel"); Memorandum of the PA and PLO in Support of Their Motion to Dismiss Counts 2 and 3 of the Third Amended Complaint at 6, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/MCALILEY (S.D. Fla. Aug. 31, 2006) (further describing their views of the conflict). These arguments go well beyond a facial attack on subject matter jurisdiction.

[8] The district court struck the motion to dismiss the Second Amended Complaint because the lawyers representing the defendants were never admitted to the district court. Order Striking Defendants' Rule 12(b) Motion to Dismiss at 1, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/BANDSTRA (S.D. Fla. July 20, 2004). However, in the memorandum in support of their motion to dismiss the Third Amended Complaint, the defendants "respectfully incorporate[d] by reference the facts contained in their prior submissions in this case including the supporting memorandum and exhibits on their motion to dismiss the second amended complaint."

17

that was occurring in February 2002 between Israeli and militant Palestinian forces in the Gaza Strip and elsewhere in the occupied Palestinian territories"); Memorandum of the PA and PLO in Support of Their Motion to Dismiss Counts 2 and 3 of the Third Amended Complaint at 6, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/MCALILEY (S.D. Fla. Aug. 31, 2006) (referring to "the illegality of the decades long Israeli occupation of Palestinian territory"). While it may be true that litigants are sometimes held to concessions or admissions of fact they make before a district court, see N. Ins. Co. of N.Y. v. Chatham County, Ga., 547 U.S. 189, 194-95 (2006); LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1202 n.34 (11th Cir. 2010), we are not convinced that in this case, and on this limited record, we are obliged to accept as true any of these concessions from defense memoranda before the district court, particularly when the defendants challenge the existence of an armed conflict before us, see City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 120 (2005) (noting that a litigant would be bound on an issue when it conceded the issue below and did not challenge the issue on appeal). But at the end of the day, even if we accept these defense concessions as admitted facts in support of the second legal theory, there is still no basis for us

Memorandum of the PA and PLO in Support of Their Motion to Dismiss Counts 2 and 3 of the Third Amended Complaint at 3, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/MCALILEY (S.D. Fla. Aug. 31, 2006).

18

to exercise subject matter jurisdiction in this case.

C.

At the defendants' behest, Muhamad Al Katzir shot Ahuva Amergi and Moshe Saperstein, unarmed civilians driving on a public highway, in a discrete violent incident. Utterly reprehensible as this act was, and notwithstanding the universal condemnation of such acts by all civilized nations, the norm allegedly violated here is, at its core, murder, and a single act of murder at that. The Supreme Court has directed us to compare any proposed cause of action under the ATS to the three torts contemplated at the time of its passage -- offenses against ambassadors, violations of safe conduct, and piracy. Sosa v. Alvarez-Machain, 542 U.S. 692, 725 (2004). Violations of this "narrow set" of international norms "threaten[ed] serious consequences in international affairs," id. at 715; we cannot say the same of the murder of Ahuva Amergi.

For one, the violent crime here was not committed by a state, or in concert with a state. See Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1265 (11th Cir. 2009). Although state action is not required, Romero v. Drummond Co., Inc., 552 F.3d 1303, 1316 (11th Cir. 2008), again, its presence is powerful evidence that the crime may be one that affects "the affairs of a nation, acting in its national capacity, in relations with another nation," Sinaltrainal, 578 F.3d at 1265.

19

Moreover, in the context of this single act of violence, the Amergi killing does not fall within the "sphere in which the[] rules binding individuals for the benefit of other individuals overlap[] with the norms of state relationships." Sosa, 542 U.S. at 715. Amergi's murder, however horrific, does not implicate foreign relations concerns in the same way that would, for example, an assault on a foreign ambassador.

We are aware of no case that holds, or even suggests, that a single murder committed by private actors in the course of an armed conflict gives rise to subject matter jurisdiction under the ATS. In Sosa, the defendant was a man who, acting at the direction of American government officials, "abducted [the plaintiff] from his house, held him overnight in a motel, and brought him by private plane to El Paso, Texas, where he was arrested by federal officers." 542 U.S. at 698. The Supreme Court held that jurisdiction would not lie under the ATS for "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment." Id. at 738. Because jurisdiction did not lie under the ATS in Sosa, nothing in the facts of that case provides support for the Amergis' legal theory.

Nor can the Amergis find support for their theory in a pair of cases from this Circuit. In Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242 (11th

Cir. 2005), the plaintiffs, seven officers in a Guatemalan trade union, brought suit against Del Monte Fresh Produce, N.A., Inc., alleging that the fruit company hired "a gang of over 200 heavily armed men," which proceeded, along with the local mayor, to abduct, detain, shove with guns, and threaten to kill the union workers, id. at 1245. Ultimately, two of the plaintiffs were taken to a radio station, where they were forced at gunpoint to denounce the union, and were later forced, also at gunpoint, to sign letters of resignation. Id. We held that the multiple death threats, committed with the mayor as an armed aggressor, constituted state-sponsored torture, and could support a claim under the ATS. Id. at 1252-53. However, the Amergis make no claim of state action, so the two cases are readily distinguishable. Moreover, we refused in Aldana to exercise subject matter jurisdiction over a number of other, non-torture claims: "Based largely on our reading of Sosa, . . . [w]e see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment." Id. at 1247; see also id. (holding, based on Sosa, that the ATS would not support jurisdiction over claims of arbitrary detention).

In Sinaltrainal, we considered allegations of "systematic intimidation, kidnapping, detention, torture, and murder of Colombian trade unionists at the hands of paramilitary forces." 578 F.3d at 1258. A "civil war provided the

21

background for the unfortunate events that unfolded," but "did not precipitate the violence that befell the plaintiffs." Id. at 1267. We held that the ATS did not provide jurisdiction over the claims of private, non-state violence, "because the alleged murder and torture was not committed in the course of a civil war." Id.

The Amergis urge a reading of Sinaltrainal by which a murder that was "committed in the course of a civil war" must give rise to ATS jurisdiction, but we are not persuaded. While we did state in dicta that "the war crimes exception applies . . . to claims of non-state torture that were perpetrated in the course of hostilities," id., the Court in Sinaltrainal did not confront any such situation, because there the civil war provided only "the background" for the killings. So the Sinaltrainal Court did not have to consider the implications of the holding that the Amergis urge on this Court now.

We further observe that the Amergis' broad reading of Sinaltrainal is contradicted by dicta appearing elsewhere in the opinion. A panel of this Court said that,

> under the ATS, the plaintiffs need not plead state action for claims of torture and murder perpetrated in the course of war crimes. Some acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual.

Id. at 1266-67 (citations and footnote omitted). This passage would require that

22

murder or torture be committed or perpetrated "in the course of war crimes." In other words, the dicta suggest the need for a war crime independent of the murder or torture at issue, even if that single act of murder or torture would itself constitute a war crime. Cf. Aldana, 416 F.3d at 1247 ("[T]o the extent that crimes against humanity are recognized as violations of international law, they occur as a result of 'widespread or systematic attack' against civilian populations." (citing Cabello v. Fernandez-Larios, 402 F.3d 1148, 1161 (11th Cir. 2005)); Kadic v. Karadzic, 70 F.3d 232, 243 (2d Cir. 1995) ("[T]orture and summary execution -- when not perpetrated in the course of genocide or war crimes -- are proscribed by international law only when committed by state officials or under color of law."). Yet the Amergis have not alleged any war crimes independent of the attack on Amergi and Saperstein.

Similarly, the Amergis' legal theory finds no support in a trio of paradigmatic pre-Sosa ATS cases. In Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984) (per curiam), the D.C. Circuit considered an action brought under the ATS by "survivors and representatives of persons murdered in an armed attack on a civilian bus in Israel in March 1978," id. at 775. In a brief opinion containing no analysis,[9] the court held that the suit was properly dismissed for lack

---

[9] "[S]eparate concurring statements of Judge Edwards, Judge Bork, and Senior Judge Robb[] indicat[ed] different reasons" for the ruling. Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 775

23

of subject matter jurisdiction.  Id.  The killing of those civilians bears a striking resemblance to the killing of Ahuva Amergi: both were acts of terrorism directed at Israelis and committed on a highway in Israel, allegedly perpetrated at the direction of the PLO.  The Amergis offer no reason to reach a conclusion contrary to what the D.C. Circuit held.

Moreover, this case differs significantly from cases in which the ATS has provided subject matter jurisdiction.  In Kadic v. Karadzic, 70 F.3d 232 (2d Cir. 1995), the Second Circuit considered allegations of "various atrocities, including brutal acts of rape, forced prostitution, forced impregnation, torture, and summary execution, carried out by Bosnian-Serb military forces as part of a genocidal campaign conducted in the course of the Bosnian civil war," id. at 236-37.  The court held that it could assert subject matter jurisdiction over the suit, even though there was no state action, under both a genocide theory and a war crimes theory. Id. at 242-43.  Yet this case does not help the Amergis, either.  While we do not "doubt for a moment that the attack" on Ahuva Amergi and Moshe Saperstein, as alleged, "amounts to barbarity in naked and unforgivable form," Tel-Oren, 726 F.2d at 823 (Robb, J., concurring), it does not compare to the allegations in Kadic, allegations which, "if proved, would violate the most fundamental norms of the

_____

(D.C. Cir. 1984) (per curiam).

24

law of war," 70 F.3d at 243.

And in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), the Second Circuit considered allegations that the inspector general of the police in Asuncion, Paraguay, kidnapped and tortured to death the son of a political dissident, id. at 878. The court, recognizing "the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice)," id. at 880, held that state-sponsored torture supports jurisdiction under the ATS, id. at 885. Yet there is no state action in the case before this Court, and there are no international agreements, let alone numerous ones, compelling the conclusion that Ahuva Amergi's murder was a violation of the law of nations.

We reach this conclusion with full awareness that the case law, including Filartiga and Kadic, urges us to consider, among other things, any international treaty obligations governing the conduct at issue. Because the Amergis assert that the defendants have violated the laws of war, we consult the four Geneva Conventions, in which "the law of war was codified." Kadic, 70 F.3d at 242. Yet even where there is a violation of the Geneva Conventions, jurisdiction under the ATS does not necessarily follow.

Article 3 of the Geneva Conventions, which is also common to all four

25

Conventions ("Common Article 3"), governs this conflict, see id. at 243 (noting that Common Article 3 "binds parties to internal conflicts regardless of whether they are recognized nations or roving hordes of insurgents"); cf. Hamdan v. Rumsfeld, 548 U.S. 557, 630 (2006) (determining that the conflict in Afghanistan between the United States and Al Qaeda was subject to Common Article 3), and we will assume that the murder of Ahuva Amergi was a violation of Common Article 3, see Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, art. 3(1)(a), Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31 ("Geneva Conventions") (prohibiting "violence to life and person, in particular murder of all kinds").[10] As best we can tell, no court ever has held that a violation of Common Article 3 necessarily gives rise to a violation of the law of nations, and for good reason. Common Article 3 is exceedingly broad and at times vague; to afford ATS jurisdiction for each and every violation of its wide-ranging provisions would violate the command of Sosa that federal courts exercise "vigilant doorkeeping." 542 U.S. at 729; compare id. at 738 ("[A] single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy."), and Aldana,

---

[10] We cite only the first Geneva Convention because Article 3 is common to all four.

416 F.3d at 1247 ("We see no basis in law to recognize Plaintiffs' claim for cruel, inhuman, degrading treatment or punishment."), with Geneva Conventions art. 3(1) (requiring that non-combatants "be treated humanely"); id. art. 3(1)(a) (prohibiting "cruel treatment"); and id. art. 3(1)(c) (prohibiting "outrages upon personal dignity, in particular humiliating and degrading treatment").[11]  In short, demonstrating a violation of the Geneva Conventions does not establish a violation of the law of nations, which is required to maintain jurisdiction under the ATS.  A plaintiff must also show the violation of a norm of international law that, if left unredressed, would "threaten[] serious consequences in international affairs."  Sosa, 542 U.S. at 715.  This the Amergis cannot do.

There is more murder in the world than genocide.  We state this unremarkable proposition because "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."  Id. at 732-33 (footnotes omitted).  We determine that asserting jurisdiction here, on the limited if not barren

---

[11] Of course, neither Sosa nor Aldana addressed the Geneva Conventions, so it cannot be said that either held that some violations of the Geneva Conventions do not give rise to ATS jurisdiction. See United States v. Seher, 562 F.3d 1344, 1361 (11th Cir. 2009) (noting that we are not bound by precedent in which the pertinent issue was neither raised nor addressed).  Nonetheless, we consider their rejection of broad-based ATS liability persuasive authority that certain violations of the Geneva Conventions do not give rise to ATS jurisdiction.

record before us, would work a dramatic, unprecedented, and unwarranted expansion of federal jurisdiction.

If it were enough to allege under the ATS a single murder committed by private actors in the course of an armed conflict, our courts would be open to effectively every incident of violence in every unstable region of the world. See Sinaltrainal, 578 F.3d at 1267; Tel-Oren, 726 F.2d at 826-27 (Robb, J., concurring). We take no pleasure in noting that the armed conflict in the Gaza Strip and the West Bank is but one of many armed conflicts the world over, see, e.g., Int'l Comm. of the Red Cross, Annual Report 2009, at 91 (2010) ("ICRC 2009 Report") (noting that, in 2009, "the ICRC was present in more than 80 countries"); United Nations, Report of the Security Council, 1 August 2008–31 July 2009, at 96-97 (2009) (noting that, in the calendar year ending July 31, 2009, the Security Council maintained fifteen peacekeeping operations and twelve assistance missions throughout the world), and that Ahuva Amergi is but one innocent victim of those ceaseless battles, see, e.g., ICRC 2009 Report at 89-90 (discussing the impact of armed conflict on civilian populations). Yet the ATS does not broadly provide for causes of action. The federal courts are empowered to open the door only "to a narrow class" of claims, Aldana, 416 F.3d at 1246-47 (quoting Sosa, 542 U.S. at 729), and the tort asserted by the Amergis -- a single

murder purportedly in the course of an armed conflict -- is anything but narrow.

The Amergis argue nevertheless that personal jurisdiction provides the necessary "limiting principle." See Tel-Oren, 726 F.2d at 826 (Robb, J., concurring). It is true that the lack of personal jurisdiction will bar some suits over which the federal courts have subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(2). Nevertheless, the ATS cases have consistently emphasized the need for federal courts to guard carefully against the overexpansion of federal subject matter jurisdiction. See, e.g., Sosa, 542 U.S. at 729; Aldana, 416 F.3d at 1246-47. We will not assume that these courts did so simply because they overlooked the fact that personal jurisdiction also provides some obvious limits to the ability of federal courts to hear cases. Cf. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583 (1999) ("The character of the two jurisdictional bedrocks unquestionably differs. . . . Accordingly, subject-matter delineations must be policed by the courts on their own initiative even at the highest level.").

Yet we do not consider merely the effects of asserting jurisdiction on the federal courts; we consider as well the effects of such a holding on U.S. foreign policy. "[T]he potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign

29

affairs." Sosa, 542 U.S. at 727. The Sosa Court noted that "many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences." Id. at 727-28 (citing Tel-Oren, 726 F.2d at 813 (Bork, J., concurring)).

Were we to assert subject matter jurisdiction in this case and on this barren record, the "collateral consequences," see id. at 727, could well be great. The issue of international terrorism "concerns an area of international law in which . . . the disagreements concern politically sensitive issues that are especially prominent in the foreign relations problems of the Middle East." Tel-Oren, 726 F.2d at 806 (Bork, J., concurring). Moreover, this case implicates the struggle between Israelis and Palestinians, an issue of U.S. foreign policy that presents numerous diplomatic and political challenges for the White House today, just as it has in years past. See, e.g., id. at 805 ("The fact remains that the PLO bears significantly upon the foreign relations of the United States."); see also id. at 822 & n.27. A federal court weighing in on claimed Palestinian war crimes could add to the complexity, and could potentially undermine American objectives in the region. See id. at 805 ("A judicial pronouncement on the PLO's responsibility for the 1978 bus attack would likely interfere with American diplomacy, which is as actively concerned with the Middle East today as it has ever been.").

We do not point out these collateral concerns to say that the federal courts should simply decline to hear cases involving politically sensitive matters of international law.  See Baker v. Carr, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.").  In fact, there can be little doubt that the ATS permits federal courts to assert jurisdiction over hot-button matters of international law.  See, e.g., Kadic, 70 F.3d 232 (concerning the Bosnian genocide).  Rather, we raise these issues, at the direction of the Supreme Court, to underscore the real-world consequences that can accompany federal judicial participation in matters of international concern.  In an ATS case such as this one, these foreign policy concerns weigh in the balance, and provide further support for our holding that, on this factual record, the district court lacked subject matter jurisdiction to hear this case.

We emphasize the limited nature of this holding, which derives in large part from the peculiar manner in which this case was framed for judicial review.  As discussed above, the Amergis in the Third Amended Complaint put forth a terrorism theory, but have not advanced this theory on appeal.  Moreover, the Amergis did not allege state action, genocide, ethnic cleansing, multiple war crimes, mass killings or rapes, nor summary execution.  We therefore do not

31

consider whether, under such theories, jurisdiction would be appropriate under the ATS.  See Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1542 (11th Cir. 1994).  We hold today only that a single murder committed by private actors, as alleged in the Third Amended Complaint, in the course of an ongoing armed conflict, as conceded by defense counsel, cannot confer subject matter jurisdiction on federal courts under the ATS.

We agree with the Second Circuit that "free[ing] all people from brutal violence" is indeed an "ageless dream."  Filartiga, 630 F.2d at 890.  Yet it is not one to be attained by asserting jurisdiction over cases when neither statute, nor precedent, nor prudence, nor factual averment so dictate.  A single murder, even of the most brutal sort, has never been accorded the status of a violation of the law of nations, and wrongs of this kind assuredly were not "on [the] minds of the men who drafted the ATS with its reference to tort."  Sosa, 542 U.S. at 715.  We take seriously our responsibility to guard federal jurisdiction under the ATS vigilantly, Sinaltrainal, 578 F.3d at 1263, and we do that again today.

## IV.

The Amergis also appeal a pair of matters of case administration.  They assert first that it was an abuse of discretion for the district court to have declined to exercise supplemental jurisdiction over their common law wrongful death claim.

32

They say next that it was an abuse of discretion for the district court, after dismissing counts two and three of the Third Amended Complaint, to sever their case from that of Moshe Saperstein. A district court does not abuse its discretion when it "has a range of choices and the court's choice does not constitute a clear error of judgment," Vanderberg v. Donaldson, 259 F.3d 1321, 1326 (11th Cir. 2001) (quotation marks and citation omitted), and we can discern no clear error of judgment on either issue.

## A.

After the district court dismissed the Amergis' ATS claim for lack of subject matter jurisdiction, it dismissed the common law wrongful death claim as well: "Having found that the Court does not have original jurisdiction under the ATS over Count 2, there is no basis to assert pendant jurisdiction over the common law claims in Count 3." Saperstein v. Palestinian Auth., No. 04-cv-20225-PAS, 2006 WL 3804718, *9 (S.D. Fla. Dec. 22, 2006) (citation omitted). The Amergis moved for reconsideration, but the district court denied the motion, "given the extraordinary inconvenience and expenditure of judicial resources" involved in hearing the Israeli law wrongful death claim. Order Denying Motion for Reconsideration and Directing Clerk to Sever Claims at 2-3, Saperstein v. Palestinian Auth., No. 04-20225-CIV-SEITZ/O'SULLIVAN (S.D. Fla. June 11,

33

2009) ("Order Denying Motion for Reconsideration"). The Amergis now assert that this was a clear error of judgment, because the district court should have heard the Amergis' common law claim alongside Saperstein's federal claim.

"The application of supplemental jurisdiction is statutorily controlled by 28 U.S.C. § 1367," Palmer v. Hosp. Auth. of Randolph County, 22 F.3d 1559, 1566 (11th Cir. 1994), which provides that,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). This section "defines the permissible boundaries for the exercise of supplemental jurisdiction; that is, it delineates the power of the federal courts to hear supplemental claims and claims against supplemental parties." Palmer, 22 F.3d at 1566 (emphasis in original).

The statute also permits the district courts to decline to exercise supplemental jurisdiction:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

34

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). This section "describes the occasions on which a federal court may exercise its discretion not to hear a supplemental claim or admit a supplemental party, despite the power of the court to hear such a claim." Palmer, 22 F.3d at 1566 (emphasis in original). If one of these four statutory factors applies, courts may also consider additional factors, which "include judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together." Id. at 1569 (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725-26 (1966)).

The district court specifically noted the "extraordinary inconvenience and expenditure of judicial resources" associated with trying the case in United States federal court. Order Denying Motion for Reconsideration at 2-3. Further underscoring the exceptional nature of these circumstances, the district court noted that the Amergis could obtain satisfaction in Israeli courts should the court decline to exercise supplemental jurisdiction. Id. at 5. This Court is permitted to consider inconvenience, expense, and fairness to the parties under Palmer/Gibbs, see Palmer, 22 F.3d at 1569, and the district court's analysis shows that trying the

35

common law claim in federal district court would be inconvenient and expensive, and that declining jurisdiction would be fair. Declining to exercise supplemental jurisdiction pursuant to § 1367(c)(4) under these unusual circumstances did not constitute an abuse of the district court's considerable discretion. See Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1185 (11th Cir. 2003).

B.

At a hearing before the district court on the motion to dismiss the Third Amended Complaint, the Amergis suggested orally that the court sever the claims brought by the Amergis and by Saperstein pursuant to Fed. R. Civ. P. 21. The district court did so in its Omnibus Order. Saperstein v. Palestinian Auth., No. 04-20225-CIV, 2008 WL 4467535, *17 (S.D. Fla. Sept. 29, 2008). The Amergis moved for reconsideration of the severance, and the district court denied the motion, noting that the Amergis themselves suggested the severance. Order Denying Motion for Reconsideration at 3-4 & n.5. The Amergis argue that the severance was improper because it denied them the opportunity to properly appeal the decision of the district court to decline supplemental jurisdiction over their wrongful death claim. In other words, even if their ATS claim had been properly dismissed, the district court still should have heard the Amergis' wrongful death claim alongside Saperstein's FTA claim.

36

Because the district court did not commit a clear error of judgment, it did not abuse its considerable discretion in severing this case. Fed. R. Civ. P. 21 reads as follows: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." At the time of the Amergis' suggestion that the district court sever, the case had become something of a nightmare. Cf. Order Denying Motion for Reconsideration at 2 ("Procedurally, this case has been an example of Murphy's Law -- if it could go wrong, it has."). The presence of Saperstein, the Saperstein family, and the Amergis had caused numerous problems. In the first place, they traveled under different legal theories -- the Sapersteins under the FTA and the Amergis under the ATS and Israeli common law. Moreover, at one point in this protracted litigation, the district court ordered default for Saperstein and invited the Amergis to file a third amended complaint. Saperstein, without permission, joined in that Third Amended Complaint, which created still further difficulties for the district court. See Saperstein, 2008 WL 4467535 at *4-17 (disposing of motions arising from that issue).

The district court plainly had sound administrative reasons to try to simplify a case that was becoming increasingly unmanageable. The court had a range of

37

choices, and it was no abuse of discretion to sever the claims so that Saperstein could proceed to trial on his FTA claim and that the Amergis could take an immediate appeal for the dismissal of their claims. See Rice v. Sunrise Express, Inc., 209 F.3d 1008, 1016 (7th Cir. 2000). Finally, the Amergis have admitted that it was they who first suggested the Rule 21 severance, and "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." In re Carbon Dioxide Indus. Antitrust Litig., 229 F.3d 1321, 1327 (11th Cir. 2000) (quotation marks and citation omitted). In any event, the decision to sever the Amergis' claims from Saperstein's does not prevent this Court from considering the issue of supplemental jurisdiction. The district court's decision to decline to exercise supplemental jurisdiction under § 1367 preceded the decision to sever, and while we are empowered in this appeal to reverse both, we have occasion to reverse neither.[12]

V.

Because the district court lacked subject matter jurisdiction over the

---

[12] Reversal is not merited on account of the Amergis' appeal of a discovery matter, either. During discovery in advance of his trial on damages, Moshe Saperstein served requests for admissions on the defendants. He requested that the admissions, to which the defendants never responded, be admitted into the record, but the district court denied the request. Saperstein v. Palestinian Auth., No. 04-20225-CIV, 2008 WL 4467535, *17 n.16 (S.D. Fla. Sept. 29, 2008). The Amergis appeal this denial, but because that decision of the district court did not in any way produce the judgment against the Amergis, we lack jurisdiction to consider the appeal. See Akin v. PAFEC Ltd., 991 F.2d 1550, 1563 (11th Cir. 1993).

Amergis' ATS claim, it did not err in dismissing count two of the Third Amended Complaint.  Moreover, it did not abuse its discretion in declining to exercise supplemental jurisdiction over the common law claim, nor in severing the case, as suggested by the Amergis.  Accordingly, the judgment of the district court is

   **AFFIRMED**.