[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 10-10711; 10-10718
_____

D.C. Docket Nos. 1:95-cv-02550-TWT; 1:98-cv-01956-TWT

UPPER CHATTAHOOCHEE RIVERKEEPER FUND, INC., et al.,

Plaintiffs,

versus

CITY OF ATLANTA,

Defendant-Third-Party-Plaintiff-Appellee,

versus

CITY OF SANDY SPRINGS,

Third-Party-Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(November 19, 2012)

Before CARNES, KRAVITCH, and FARRIS,[*] Circuit Judges.

PER CURIAM:

A federal Clean Water Act lawsuit filed against the City of Atlanta in 1995 resulted in two consent decrees requiring Atlanta to clean up its sewer system. Ten years later Sandy Springs incorporated, which led to state court proceedings to determine whether Atlanta would be allowed to continue to supply Sandy Springs with water. Atlanta had pledged its water service revenue as part of the collateral for bonds that were issued to finance its compliance with the sewer system consent decrees. Atlanta persuaded the same district court that had issued the sewer system consent decrees to enjoin the parties from pursuing the state law proceedings and to take over supervision of those proceedings. The question is whether the district court had jurisdiction to do that.

## I.

For more than a decade the United States District Court for the Northern District of Georgia has been monitoring the City of Atlanta's compliance with two consent decrees that the court issued in September 1998 and December 1999. Those consent decrees resolved complex, multi-party litigation arising from

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

Atlanta's violation of the Clean Water Act, 33 U.S.C. §§ 1251 et seq., and required Atlanta to bring its sewer system into compliance with federal environmental laws.  See Upper Chattahoochee Riverkeeper Fund, Inc. et al. v. City of Atlanta, 1:95-cv-2550-TWT; United States et al. v. City of Atlanta, 1:98-cv-1956-TWT.  The decrees, however, did not specify how compliance with them is to be financed. Atlanta decided to fund its compliance efforts by issuing bonds, pledging as collateral for them the assets and revenues from its water and sewer system.[1]

The consent decrees specifically state that the district court "shall retain jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions" of the decrees.  Cf. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381–82, 114 S.Ct. 1673, 1677 (1994) (explaining that a district court may "retain jurisdiction" over a "dismissal-producing settlement agreement" at the parties' request).  And the court has done so.  The court's traditional equitable powers also give it ongoing jurisdiction to supervise Atlanta's compliance, to enforce the terms of the consent decrees, and to protect its

---

[1]Atlanta has spent approximately $1.3 billion on capital improvements required by the consent decrees.  Almost all of this amount was financed by water and sewer revenue bonds, under which Atlanta pledged the value of its drinking and wastewater system, as well as current and future revenues from operating that system.  Atlanta's indebtedness under these bonds was $3.2 billion at the time the district court's order was entered in the present case.

jurisdiction over the decrees from collateral threats.  See, e.g., United States v.

Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462 (1932); Wesch v. Folsom, 6

F.3d 1465, 1470 (11th Cir. 1993).

In December 2005, while Atlanta's compliance efforts and the district

court's monitoring of them continued, Sandy Springs, which is located in Fulton

County, Georgia, was incorporated as a municipality.  Both before and after Sandy

Springs was incorporated, Fulton County provided its sewer service and Atlanta

provided its water service.[2]

---

[2]Atlanta describes its water and sewer system as functionally and financially unified:

> For over a century, drinking water and wastewater treatment have been developed
> as complementary components of Atlanta's regional utility, in recognition of the
> fact that the provision of potable water must be accompanied by treatment of
> wastewater prior to its return to the area's rivers and streams.  One component
> cannot function without the other, as the services are inextricably linked.  In
> addition to their functional and environmental linkage, drinking water and
> wastewater are linked financially, as both components have been pledged by
> Atlanta to secure the funding needed to meet its obligations under the Consent
> Decrees.

Br. of Appellee at 8–9 (record citations omitted).  Robert Hunter, Atlanta's Commissioner for the
Department of Watershed Management, testified at the motion hearing before the district court
that Atlanta's water and sewer systems are bound together by bonds: "[T]his is one system, water
and wastewater.  It's one fund.  We only issue bonds for water and wastewater.  We don't have a
separate water fund and a separate wastewater fund, and this is very common in combined
utilities."  Doc. 241 at 58.

We note for purposes of this appeal, however, it is undisputed that Atlanta provides
Sandy Springs' water service, and Fulton County provides its sewer service.  Fulton County and
Sandy Springs have already agreed to continue that arrangement.

Atlanta does not contend that it is in danger of losing sewer revenues from Sandy

4

Georgia's Service Delivery Strategy Act, Ga. Code Ann. §§ 36-70-20 et

seq., requires every Georgia county and each of the municipalities within it to

adopt a service delivery agreement that identifies the service provider, service

areas, and all funding sources for governmental services provided in the county.

Id. §§ 36-70-20, 36-70-23, 36-70-26.  The Act also prescribes a process for

reaching that agreement and resolving any disagreement, which "is intended to

minimize inefficiencies resulting from duplication of services and competition

between local governments and to provide a mechanism to resolve disputes over

local government service delivery, funding equity, and land use."  Id. § 36-70-20.

As one court has explained it, the Act "mandates a dispute resolution procedure

---

Springs.  Commissioner Hunter testified at the motion hearing that Atlanta indirectly receives
revenue from the sewer service that Fulton County provides to Sandy Springs:

> Q.  And as to the sewer system, the entire sewer system within the City of Sandy
> Springs is supplied as far as the rates, charges, servicing of it by Fulton County; is
> that correct?
>
> A.  It is supplied by Fulton County.  It is billed through the City of Atlanta.  And
> the flow that comes from Sandy Springs into the City of Atlanta, Atlanta is paid
> for those flows.
>
> Q.  And you have governmental agreements with Fulton County that address those
> rates, the requirements of Fulton County to cover the cost for the City of Atlanta;
> is that also correct?
>
> A.  We have an agreement for the flows coming from their pipes to our pipes.

Doc. 241 at 89–90.

for the affected county and municipality to follow if they cannot agree on a service delivery strategy." Cobb Cnty. v. City of Smyrna, 606 S.E.2d 667, 671 (Ga. Ct. App. 2004); see also Ga. Code Ann. § 36-70-25.1.

An October 2005 service delivery agreement designated Atlanta as the direct retail water service provider for all of unincorporated Fulton County, which included the area that was—just two months later—incorporated as the City of Sandy Springs. Its incorporation triggered some provisions of the Service Delivery Act. The Act provides that when new municipalities are incorporated,"[e]ach county and affected municipality shall review, and revise if necessary, the approved" service delivery agreement. Id. § 36-70-28(b)(4). After Sandy Springs was incorporated, the process of reviewing and revising Fulton County's service delivery agreement began, and Sandy Springs proposed amendments to the retail water service provider part of that agreement. Some of those amendments, if adopted, would affect the supply of water to Sandy Springs and could reduce the amount or price of the water that it purchases from Atlanta.

Negotiations among Fulton County and several of its municipalities to adopt new service delivery agreements stalled in October 2009, and Fulton County followed the dispute resolution procedure prescribed by Georgia's Service Delivery Strategy Act:  it filed a petition in Fulton County Superior Court

6

"seeking mandatory mediation."  See Ga. Code Ann. § 36-70-25.1(d)(1)(A).  The state court appointed a mediator.

Atlanta returned to the federal district court, which had retained jurisdiction to enforce the Clean Water Act consent decrees, and sought to enjoin the service delivery proceedings that were ongoing in state court.  The district court granted Atlanta's motion, enjoined the parties from continuing to pursue the service delivery proceedings in state court, and brought Sandy Springs and Fulton County into the Clean Water Act litigation in federal court as third party defendants.  While that action may have been pragmatic, we conclude that it went beyond the court's jurisdictional authority.

## II.

In its order the district court recounted how disputes "relating to water and sewer service" had arisen between Fulton County and some cities located within it—Atlanta, College Park, Fairburn, Palmetto, Sandy Springs, and Union City.[3]  Doc. 242 at 2.  The court determined that those disputes had "created considerable uncertainty" about Atlanta's ability "to finance improvements to the sewer system

---

[3]The South Fulton Municipal Water and Sewer Authority, the City of Fairburn, the City of Palmetto, and the City of Union City were originally parties to this appeal, but they have settled their disputes with Atlanta and dismissed their appeals.  See City of Atlanta v. South Fulton Mun. Reg'l Water and Sewer Auth., Nos. 10-10710 & 10-10721.  In the district court, Atlanta dismissed its claims against the City of College Park.

that are necessary to comply with the Consent Decrees." Id.  It believed that Federal Rules of Civil Procedure 19 and 21 gave it the "authority to join the Third-Party Defendants," including the City of Sandy Springs and Fulton County, in order "to avoid the uncertainty, and substantial and immediate threats" to Atlanta's ability to comply with the consent decrees. Id. at 3.  The court also concluded that the consent decrees along with "the Clean Water Act, and the Court's powers under the All Writs Act and its Supplemental Jurisdiction under 28 U.S.C. § 1367" gave it the "authority to take actions to prevent interference with the City of Atlanta's continued ability to comply with the Consent Decrees." Id. at 3–4.

The district court's order went on to prohibit Georgia, Fulton County, and Sandy Springs from using the process that Georgia law prescribed for determining how water would be delivered to citizens in the state.  The order stated that: "[The] State of Georgia and . . . Fulton County [are] enjoined from applying the Georgia Service Delivery Act procedures under O.C.G.A. § 36-70-20 et seq. to the City of Atlanta . . . with respect to the provision of water and sewer services." Id. at 4.  The court's order also "held in abeyance" the sanctions that Georgia law automatically imposes on local governments that do not execute a service delivery agreement, see Ga. Code Ann. § 36-70-27(a)(1).  Doc. 242 at 4.  It enjoined Fulton County from proceeding any further with the state law-prescribed mandatory

8

mediation in Fulton County Superior Court "with regard to any matter related to the water and sewer service portions" of the county's service delivery agreement. Id. at 5.

After prohibiting the state, the county, and the affected municipalities from using the state's own process or court system to resolve the local service delivery dispute, the district court compelled the state, the county, and the municipalities to submit the dispute to it for supervision and a decision. The court order required that:

> The City of Atlanta, Fulton County, and the Third-Party Defendants [shall] conduct any and all negotiations, mediation and other dispute resolution efforts, including those dispute resolution procedures referenced under O.C.G.A. § 36-70-25.1, and if those dispute resolution efforts are unsuccessful, any litigation required to determine the Service Delivery Strategy for Fulton County, as it relates to the water and sewer service portions of the Service Delivery Strategy, under the exclusive supervision of this Court.
>
> . . . [T]he Service Delivery Act mediation as related to the sewer and water issues . . . shall occur exclusively under this Court's supervision.

Id. The district court appointed a mediator who would be supervised by and accountable to the district court, instead of by and to any state court or judge. (The mediator the district court appointed was former Georgia Supreme Court Justice Norman Fletcher, who had also been appointed by and had been serving

9

under the supervision of the state court when the dispute was being handled there.) Id.

This is Sandy Springs' appeal of the district court's order. We have jurisdiction over it under 28 U.S.C. § 1292(a)(1), which provides that "the courts of appeals shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts . . . granting . . . injunctions."

## III.

In asserting authority to enjoin the parties from pursuing the service delivery proceedings in state court, the district court relied on its continuing jurisdiction to enforce Atlanta's compliance with the consent decrees coupled with its power under the All Writs Act. That Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

The power granted federal courts by the All Writs Act is, however, limited by the Anti-Injunction Act, which prohibits a federal court from "grant[ing] an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or

effectuate its judgments." 28 U.S.C. § 2283.[4]  If one of the three specific exceptions contained in the Anti-Injunction Act permits an injunction, the All Writs Act grants a federal court the power to issue it.  Burr & Forman v. Blair, 470 F.3d 1019, 1027–28 (11th Cir. 2006).

"[I]n assessing the propriety of an injunction entered to stop a state court proceeding, the sole relevant inquiry is whether the injunction qualifies for one of the exceptions to the Anti-Injunction Act."  Id. at 1028; see also Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 286, 90 S.Ct. 1739, 1743 (1970) (emphasizing that the Anti-Injunction Act is "an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of [the Act's] three specifically defined exceptions.").  We review de novo a district court's legal conclusion that it has the authority to enjoin a state court action based on an exception to the Anti-Injunction Act.  Estate of Brennan v. Church of Scientology Flag Serv. Org., 645 F.3d 1267, 1272 (11th Cir. 2011).

The Supreme Court has recognized that the Anti-Injunction Act "is designed

---

[4]Although on its face the Anti-Injunction Act could be read to apply only to injunctions issued against state courts, and not those issued against individual parties, it has not been interpreted that way.  See Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs, 398 U.S. 281, 287, 90 S.Ct. 1739, 1743 (1970).  Instead, "we treat injunctions entered for the purpose of halting a state court proceeding the same regardless of whether issued against the parties to the state court proceeding or directly against the state court."  Burr & Forman v. Blair, 470 F.3d 1019, 1028 n.28 (11th Cir. 2006).

11

to prevent conflict between federal and state courts." Leiter Minerals, Inc. v. United States, 352 U.S. 220, 225, 77 S.Ct. 287, 290–91 (1957). The Act's "core message is one of respect for state courts," and it "broadly commands that those tribunals shall remain free from interference by federal courts" unless one of the Act's three specific exceptions is met. Smith v. Bayer Corp., — U.S. —, 131 S.Ct. 2368, 2375 (2011) (quotation marks omitted).

The district court never indicated which of the three exceptions to the Anti-Injunction Act, if any, it was relying on. The only one that Atlanta contends applies is the "in aid of its jurisdiction" exception. That exception, like the other two, must be construed narrowly. See id. (cautioning that the three exceptions in the Anti-Injunction Act "are narrow and are not to be enlarged by loose statutory construction" (quotation marks and alteration omitted)); see also In re Bayshore Ford Trucks Sales, Inc., 471 F.3d 1233, 1250 (11th Cir. 2006) ("The Supreme Court has repeatedly emphasized that the lower courts are to interpret these exceptions strictly."); Delta Air Lines, Inc. v. McCoy Rests., Inc., 708 F.2d 582, 585 (11th Cir. 1983) ("Because of the sensitive nature of federal interference with state court litigation, the exceptions to the rule against injunctions . . . must be narrowly construed."); T. Smith & Son, Inc. v. Williams, 275 F.2d 397, 407 (5th Cir. 1960) ("The phrase, 'where necessary in aid of its jurisdiction', . . . should be

12

interpreted narrowly, in the direction of federal non-interference with orderly state proceedings."); cf. id. (discussing the "hands-off doctrine" expressed in the Anti-Injunction Act and describing the statute as "a pillar of federalism").  As the Supreme Court has put it:  "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed. . . ."  Atl. Coast Line R.R., 398 U.S. at 297, 90 S.Ct. at 1748; see also Red Rock Cola Co. v. Red Rock Bottlers, Inc., 195 F.2d 406, 409 (5th Cir. 1952) ("Federal Courts will enjoin proceedings in State Courts with reluctance. . . ."); cf. Smith, — U.S. at —, 131 S.Ct. at 2375–76 (stating that issuing an injunction under the "relitigation exception [to the Act] is resorting to heavy artillery" and "[f]or that reason, every benefit of the doubt goes toward the state court"); Wesch, 6 F.3d at 1469 ("The question of whether to stay proceedings in a state court is never one to be taken lightly, as it impinges on the very delicate balance struck between the federal and state judicial systems.").

Necessity is key.  The exception in question does not permit injunctions in aid of a court's jurisdiction, but only those that are "necessary in aid of its jurisdiction."  It certainly "is not enough that the requested injunction is related to that jurisdiction."  Atl. Coast Line R.R., 398 U.S. at 295, 90 S.Ct. at 1747.  Federal courts may enjoin state court proceedings based on the "necessary in aid of its

13

jurisdiction" exception in only two situations, where: "(1) the district court has exclusive jurisdiction over the action because it had been removed from state court; or, (2) the state court entertains an in rem action involving a res over which the district court has been exercising jurisdiction in an in rem action." In re Bayshore Ford Trucks Sales, Inc., 471 F.3d 1233, 1251 (11th Cir. 2006).

As Atlanta admits, there was no "removal," in the required sense, of this case from state court to federal court, so the first situation does not exist. The question is whether the second one does. The reason that the second situation is an exception to the Anti-Injunction Act prohibition is that "[a] state court and a federal court cannot simultaneously exercise in rem jurisdiction over the same property." United States v. $270,000 in U.S. Currency, Plus Interest, 1 F.3d 1146, 1147 (11th Cir.1993); see also In re Am. Honda Motor Co. Dealerships Relations Litig., 315 F.3d 417, 439 (4th Cir. 2003) ("The 'necessary in aid of its jurisdiction' exception to the Anti-Injunction Act is widely understood to apply most often when a federal court was the first in obtaining jurisdiction over a res in an in rem action and the same federal court seeks to enjoin suits in state courts involving the same res.").

Atlanta contends that its water and sewer system is a res over which the district court has exercised its jurisdiction through the consent decrees, which

14

impose "extensive ongoing obligations relative to . . . the wastewater collection, transmission, and treatment components" of the system.  The problem with Atlanta's contention is that the state service delivery proceedings in state court are obviously not an in rem action.  Those proceedings do not directly involve any res.  Instead, they involve a dispute about the delivery of services, which is a quintessential in personam dispute.  Cf. Burr & Forman, 470 F.3d at 1032 & n.34; Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 642, 97 S.Ct. 2881, 2893 (1977) ("The traditional notion is that in personam actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that the ['necessary in aid of its jurisdiction'] exception to [28 U.S.C.] § 2283 was intended to alter this balance.").  Because there is no in rem action in state court, the state court and the federal court are not adjudicating rights to the same property, and the in rem exception does not apply.  See Burr & Forman, 470 F.3d at 1031–32 (explaining that the "focus of this exception is on parallel in rem proceedings—one in federal court, the other in state court").  Because the state proceedings are not an in rem action directly involving a res, the state and federal court are not in danger of simultaneously exercising in rem jurisdiction over the same property.  $270,000 in U.S. Currency, Plus Interest, 1 F.3d at 1147; see also Empire Trust Co. v. Brooks, 232 F. 641, 645–46 (5th Cir. 1916) ("[W]here the

15

issues in the subsequent suit are different from those involved in the first suit, and the subject-matter is not identical, there can be no infringement of the jurisdiction of the court in which the first suit is pending, by reason of the institution of the second suit in a court of concurrent jurisdiction."); Denver-Greeley Valley Water Users Ass'n v. McNeil, 131 F.2d 67, 71 (10th Cir. 1942) ("[T]he necessity does not exist which would warrant injunctive relief where the subsequent action does not create a conflict between the courts over the possession or custody of the res."). For these reasons, the second situation in which a federal court is allowed to enjoin state court proceedings under the "necessary in aid of its jurisdiction" exception to the Anti-Injunction Act does not apply here.[5]

The motivation for the issuance of the injunction against the state court proceedings was the fear that those proceedings could result in a reduction in some of Atlanta's water service revenue, which could impede its efforts to comply with its consent decree obligations because that revenue is pledged as part of the collateral for the bonds Atlanta issued to finance its compliance with the decrees. When the district court entered the consent decrees requiring that the sewer system be cleaned up, it left to Atlanta the task of financing its compliance with those

---

[5]Atlanta's contention that the Clean Water Act litigation itself is a res over which the district court has exercised in rem jurisdiction fails for the same reasons.

16

decrees. It was Atlanta's decision to issue bonds to finance some of its compliance efforts. It was Atlanta's decision to pledge its water and sewer system revenue to pay off those bonds. If the water system revenue declines for any reason, the problem will affect the bond holders and the City of Atlanta. It will not affect the federal court's jurisdiction over the consent decrees and over their enforcement.

If the potential reduction in water system revenue is large enough—and there has been no showing that it is—Atlanta may have a problem paying off the bonds that have already been issued, but that will be Atlanta's problem, not the district court's.[6] If some additional revenue is required to offset any that Atlanta loses, it will be Atlanta's responsibility to find that revenue, not the district court's. In the way that matters, a threatened decline in revenue for this reason is no different from a decline in revenue for some other reason, such as decreased usage among existing water customers. The fact that the state service delivery proceedings may reach a result that will make it more difficult for Atlanta to pay off the bonds that it has issued to pay for the cleanup does not make an injunction

---

[6]According to Atlanta, "[a]bout 13 percent of its total revenues in fiscal year 2008-2009 came from sales of water outside the city boundaries," which amounts to about $41 million per year. The record does not indicate how much of that revenue comes specifically from providing water service to Sandy Springs or whether Atlanta could make up, in some other way or from some other source, any revenue it may lose from not providing water service to Sandy Springs.

17

against those state proceedings necessary in aid of federal court jurisdiction over the consent decrees. Cf. Atl. Coast Line R.R., 398 U.S. at 295, 90 S.Ct. at 1747 ("[I]t is not enough that the requested injunction is related to [the federal court's] jurisdiction, but it must be 'necessary in aid of' that jurisdiction." (emphasis added)).

The district court was sensitive to anything that threatened to impede Atlanta's compliance with the two consent decrees. We do not blame the court for that. Its sensitivity is understandable in light of the vast amount of time and effort that the court has devoted to the underlying Clean Water Act case, to the consent decrees, and to their implementation. But no amount of good motives and no amount of expended time or effort can bestow on a federal court the authority to interfere with a sovereign state's proceedings. Only the Constitution and Congress can do that, and neither has done so here. See Save the Bay, Inc. v. U.S. Army, 639 F.2d 1100, 1102 (5th Cir. Feb. 1981) ("We have only the authority endowed by the Constitution and that conferred by Congress.").

## IV.

We turn now to the supplemental jurisdiction issue. In addition to relying on the All Writs Act as a source of authority for enjoining the parties from pursuing the state service delivery proceedings, the district court concluded that

18

under 28 U.S.C. § 1367(a) it also had supplemental jurisdiction over those proceedings; that was an alternative basis for taking over the proceedings and deciding the issues raised in them. The district court did not explain how its federal question jurisdiction over the Clean Water Act litigation allowed it to exercise supplemental jurisdiction over the water delivery service issues in the state proceedings.

Section 1367(a) gives federal courts "the power to exercise supplemental jurisdiction over all claims that arise out of a common nucleus of operative fact with a substantial federal claim." Tamiami Partners, Ltd. ex rel. Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla., 177 F.3d 1212, 1223 (11th Cir. 1999) (quotation marks omitted); see also 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). We review de novo a district court's legal conclusion that it has subject matter jurisdiction over a case or controversy. See, e.g., MacGinnitie v. Hobbs Group,

19

LLC, 420 F.3d 1234, 1239 (11th Cir. 2005).[7]

The federal Clean Water Act litigation and the state service delivery proceedings involve different issues under different law arising from different sets of facts occurring in different decades. The federal litigation arose from environmental law violations in the operation of Atlanta's sewer system during the 1990s. The state proceedings arose from disagreements about where Sandy Springs can get its water service after it incorporated in 2005.

As we have acknowledged, Atlanta did issue bonds to finance its sewer cleanup efforts, pledging the revenues from its sewer and water system as collateral for those bonds. And, if left to the state law merits of the matter, the state service delivery proceedings may result in a decrease in the revenue stream coming from the water system, which Atlanta fears would undermine its ability to comply with the consent decrees. Atlanta's position is that by trying to wrest from

---

[7]Atlanta asserts that the district court's decision about whether to exercise supplemental jurisdiction should be reviewed only for an abuse of discretion. If a district court's jurisdiction over a claim arises from 28 U.S.C. § 1367(a), the court has some discretion about whether to exercise that jurisdiction if any of the factors set out in § 1367(c) exist. It is a district court's discretionary decision under § 1367(c) about whether to exercise its supplemental jurisdiction that we review for an abuse of discretion. See, e.g., Estate of Amergi ex rel. Amergi v. Palestinian Auth., 611 F.3d 1350, 1356 (11th Cir. 2010). In the present case, however, the issue is not how the district court should have exercised its discretion in regard to supplemental jurisdiction that it had. The issue is whether the district court had supplemental jurisdiction to begin with, and that is a question of law we review de novo. See, e.g., Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1314 (11th Cir. 2004).

20

it the water system located in Sandy Springs, and thereby threatening its revenue, Sandy Springs has "implicated the same case or controversy as the Clean Water Act claims." Br. of Appellee at 45.

Atlanta is wrong. The test is not whether the same case or controversy is "implicated." The test is whether the claims asserted "derive from a common nucleus of operative fact." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 (1966). We take the nucleus of facts on which the federal question claims are based and compare it to the nucleus of facts on which the state law claims are based. We do not look at the results that may flow from the implications of finding that supplemental jurisdiction does not exist. It is not a results-oriented analysis, but a fact-oriented one.[8]

How Atlanta pays for its sewer cleanup efforts (or even whether it pays for them) does not change the factual predicate that gave rise to the Clean Water Act litigation. That factual predicate was a sewer system that was in violation of

---

[8]Atlanta relies on Parker v. Scrap Metal Processors, Inc., 468 F.3d 733 (11th Cir. 2006), to support its argument that the district court properly exercised supplemental jurisdiction in this case. That decision does not help Atlanta at all. As all of the parties in Parker agreed, the federal and state claims in that case arose out of a common nucleus of operative fact, giving the district court the power to exercise supplemental jurisdiction over the state law claims. See id. at 743. The issue Parker decided was whether the district court had abused its discretion by declining under 28 U.S.C. § 1367(c) to exercise supplemental jurisdiction that it had. Id. at 738. That is not the issue before us here.

federal clean water laws. The state service delivery proceedings about the source of Sandy Springs' water service do not derive from a polluting sewer system or any federal Clean Water Act violations. They derive instead from Sandy Springs' incorporation and a dispute about how water service is to be handled in the newly incorporated city.

Atlanta's test for supplemental jurisdiction would grant federal courts jurisdiction over any state law claim that could potentially affect revenues used to comply with a federal court decree, regardless of the claim's factual predicate. Consider an example. A city pledges the revenue it gets from an occupational tax to pay the bonds it has issued to fund compliance with a federal court decree involving Clean Water Act violations. If litigation is filed in state court over the state constitutional validity of that occupational tax, under Atlanta's approach the federal court would have supplemental jurisdiction to decide that purely state law issue because the outcome could potentially affect revenues used to pay bonds issued to fund efforts to comply with the federal court decree. Supplemental jurisdiction is not that malleable.

The district court erred in concluding that it had supplemental jurisdiction

22

over the state service delivery proceeding issues.[9]

## V.

We must keep federal judicial power confined within the "exact degrees and character" set out by Congress, Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1179 (11th Cir. 2011), and we should guard against anything that disrupts the delicately balanced system of dual sovereignty that is one of the foundation stones underlying our Constitution.  See Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 17, 71 S.Ct. 534, 542 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation . . . ."); Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 703 (1934) ("Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined."); Russell Corp. v. Am. Home Assur. Co., 264 F.3d 1040, 1050 (11th Cir. 2001) ("[T]here is a presumption against the exercise of federal jurisdiction . . . ."); Smith v. GTE Corp., 236 F.3d 1292, 1299 (11th Cir. 2001) ("[F]ederal courts should proceed with caution in construing

---

[9]Relying on Federal Rules of Civil Procedure 19 and 21, the district court joined Sandy Springs as a third-party defendant in the Clean Water Act litigation.  Because the district court lacked subject matter jurisdiction over the state court service delivery proceedings, it necessarily follows that joinder of Sandy Springs in the Clean Water Act litigation was improper.

23

constitutional and statutory provisions dealing with their jurisdiction." (quotation marks & alteration omitted)); Eighth Reg'l War Labor Bd. v. Humble Oil & Ref. Co., 145 F.2d 462, 464 (5th Cir. 1944) ("The jurisdiction of the district court is confined within strict limits . . . ."); Le Mieux Bros. v. Tremont Lumber Co., 140 F.2d 387, 389 (5th Cir. 1944) ("United States District Courts are courts of limited jurisdiction.  Creatures of statute, they have only such jurisdiction as the statutes expressly confer, and this jurisdiction must always affirmatively appear.").  The district court exceeded the scope of its authority by exercising jurisdiction over the state service delivery proceedings.

The district court's order enjoining Fulton County and Sandy Springs from pursuing the state service delivery proceedings in state court is **VACATED**, and the case is **REMANDED** with instructions for the district court to dismiss for lack of subject matter jurisdiction Atlanta's Amended Third-Party Complaint against Sandy Springs.

24