[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12798
_____

D.C. Docket No. 9:10-cv-81106-KLR


MAMMA MIA'S TRATTORIA, INC.,
a Florida corporation,

                                        Plaintiff,

BERSIN BAGEL GROUP, LLC,

                                         Interested Party - Appellant,

versus

THE ORIGINAL BROOKLYN WATER BAGEL CO., INC.,
a Florida corporation,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

Before MARCUS, Circuit Judge, and PROCTOR[*] and EVANS,[**] District Judges.

MARCUS, Circuit Judge:

When the Original Brooklyn Water Bagel Company ("OBWB") settled a qui tam false marking suit, the district court entered a final judgment that barred future lawsuits against OBWB related to certain false patent marking or advertising. Thereafter, Bersin Bagel Group, LLC ("Bersin") sued OBWB in state court for damages tied to Bersin's investment in an OBWB franchise. OBWB sought, and the district court issued, an order that purported to enforce the federal judgment by enjoining Bersin's state court suit. Bersin appeals that order, but we lack jurisdiction to hear its challenge. The order was not final under 28 U.S.C. § 1291 because it was not the proper tool for enforcing an injunction: it did not hold a noncompliant party in contempt or impose sanctions. See Thomas v. Blue Cross & Blue Shield Ass'n (Thomas II), 594 F.3d 823, 829-30 (11th Cir. 2010). Nor was the district court's order an appealable interlocutory decision for purposes of § 1292(a)(1). Instead of granting or modifying an injunction, it merely clarified the existing injunction found in the district court's judgment. See id. at 831-32. Without jurisdiction, we must dismiss this appeal.

I.

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[**] Honorable Orinda Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

Appellee OBWB is a Florida corporation and the parent company of Brooklyn Water Bagel Franchise Co., Inc. ("BWB"), which franchises a quick service restaurant concept featuring the sale of bagels, coffee, bottled water, beverages, and related products. Steven M. Fassberg is OBWB's and BWB's CEO and former president. Appellant Bersin is a Florida limited liability company that entered a franchise agreement with BWB in August 2010 for a restaurant on Alton Road in Miami-Dade County, Florida. Bersin alleges in its state court suit that it suffered damages from the deal because of misrepresentations by Fassberg and his companies. However, OBWB believes that Bersin's claims were released as part of a settlement in a federal qui tam action involving alleged false patent marking by OBWB.

First came the qui tam action. On September 17, 2010, Mamma Mia's Trattoria, Inc. ("Mamma Mia's"), a Florida corporation that owns and operates an Italian restaurant, sued OBWB in federal district court on behalf of itself and as qui tam relator representing the United States of America and the general public. Mamma Mia's cited violations of 35 U.S.C. § 292, which at that time provided, inter alia:

> (a) . . . Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public . . . [s]hall be fined not more than $500 for every such offense.

3

(b) Any person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States.[1]

35 U.S.C. § 292 (2006).

In its amended complaint, Mamma Mia's alleged that "OBWB falsely claims to the public and advertises in interstate commerce that it makes, uses and sells bagels and other food products, including bottled water, which are unique and exclusive to any other manufacturer or seller" because the products "derive from a 'patented 14 stage water treatment process' or 'patented 14 stage water treatment system' that replicates Brooklyn, New York water, allegedly creating bagels, bottled water, and water for other products identical to those made, used and sold in Brooklyn, New York."  Mamma Mia's claimed that OBWB made numerous misrepresentations in advertising in connection with its products: on its website, YouTube, and Twitter; on a sign on restaurant equipment; on OBWB's menus and Menu Board; and in "dozens of press releases and other advertising."  Mamma Mia's further alleged that "[t]he false claims are knowingly, purposefully and willfully being asserted and condoned by OBWB to support and give credence to OBWB's claim that it alone has the exclusive capability to make Brooklyn water at locations outside New York," even though "OBWB neither owns nor holds any

---

[1] In 2011, Congress amended the false marking statute so that "[o]nly the United States may sue for the penalty authorized by this subsection," 35 U.S.C. § 292(a) (2012), except "[a] person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury," id. § 292(b).   See Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 16(b)(1-2), 125 Stat. 284, 329 (2011).

patents whatsoever as recognized by the official records of the United States Patent and Trademark Office."

On March 16, 2011, Mamma Mia's, with the consent of the United States Department of Justice, entered into a Settlement Agreement with OBWB. On March 28, the district court entered a Final Consent Judgment, finding that Mamma Mia's had standing to pursue and dispose of the claims on behalf of the United States and the general public pursuant to 35 U.S.C. § 292. In dismissing the action, the district court also

> ORDER[ED] and ADJUDGE[D] that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any past or existing product, advertising regarding patented process, water treatment system, technology, water, ice cubes, or "Cubsta machine", covered by this Stipulation of Dismissal, that has been marked, manufactured, sold, distributed, advertised or promoted by OBWB prior to entry of this Final Judgment, is barred.

A year after the Final Consent Judgment, Bersin sued Fassberg and BWB in Florida circuit court in Miami-Dade County, alleging that Bersin had been induced into investing more than $350,000 in the Alton Road BWB franchise through fraud and misrepresentations, some of which concerned OBWB's advertising of patented technology. Bersin claimed that Fassberg also stated the Alton Road shopping center was a perfect location for a "flagship" restaurant that would gross at least $1,500,000 in annual sales, and that Bersin could sit back and collect a check, with Fassberg handling operations. In its June 19, 2012, second amended complaint,

5

Bersin alleged that Fassberg induced Bersin's investment in the Alton Road restaurant by conveying "false and misleading information regarding Defendants' advertising and marketing claims" concerning a "patented 14 stage water treatment process" or "patented technology."  Bersin brought three state law causes of action: (I) fraud in the inducement; (II) negligent misrepresentation and omission; and (III) violation of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201-.213.

To stop Bersin's state suit, OBWB turned to the federal district court that had issued the qui tam Final Consent Judgment.  On March 8, 2013, OBWB filed a motion to enforce that judgment, arguing that Bersin's claims were barred.  On May 22, 2013, the district court entered an Enforcement Order granting that motion.  The district court concluded that Bersin was in fact "asserting barred claims" in its state court action because "the main underlying basis for all of these claims are false marking and advertising, which were released and barred by the Settlement Agreement and Final Consent Judgment."  As a result, the district court order "enjoined" each Bersin state cause of action -- Counts I, II, and III -- because they "relate[d] to patents and product advertising."[2]  Bersin appeals, arguing that

---

[2] In its Enforcement Order, the district court

> ORDER[ED] AND ADJUDGE[D] that the motion to enforce final consent judgment of dismissal with prejudice . . . is GRANTED.  The causes of action in [Bersin's state suit] that relate to patents and product advertising, including all the materials and statements made prior to March 28, 2011 are

6

the district court erred in granting OBWB's motion because Bersin's claims were not barred by the Final Consent Judgment, the district court lacked jurisdiction over Bersin's case, and, in any event, the Anti-Injunction Act prohibited the court from enjoining Bersin's state court suit.

## II.

We are obliged to first address our power to review Bersin's claims. See, e.g., Holloman v. Mail-Well Corp., 443 F.3d 832, 844 (11th Cir. 2006) ("The federal courts of appeals are courts of limited jurisdiction."); Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1334 (11th Cir. 1999) ("As an initial matter, we must address our jurisdiction to review Appellants' claims."). OBWB moved to dismiss Bersin's appeal on the ground that this Court lacks appellate jurisdiction. Bersin responded that we have jurisdiction to review the district court's decision either as a final order pursuant to 28 U.S.C. § 1291, or as an order modifying and expanding a prior injunction under § 1292(a)(1). We do not agree. In the absence of any discernible basis for exercising appellate jurisdiction, we are compelled to dismiss Bersin's appeal.

---

ENJOINED. This injunction includes each of the three counts in the Bersin Bagels Litigation:

a. Count I -- fraud in the inducement;

b. Count II -- negligent misrepresentation and omission;

c. Count III -- violation of FDUTPA.

7

Congress has constrained our appellate jurisdiction to only a few, well-defined types of actions.  Thomas II, 594 F.3d at 828 (noting that "our jurisdiction is limited to a narrow class of decisions").  As relevant here, we may hear appeals "from all final decisions of the district courts of the United States."  28 U.S.C. § 1291; see World Fuel Corp. v. Geithner, 568 F.3d 1345, 1348 (11th Cir. 2009).  We also may entertain challenges to "[i]nterlocutory orders of the district courts of the United States . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  28 U.S.C. § 1292(a)(1); see Birmingham Fire Fighters Ass'n 117 v. Jefferson Cnty., 280 F.3d 1289, 1292 (11th Cir. 2002).

We lack appellate jurisdiction to hear this case under either section.  As for the requirement of a final district court order, we begin by reiterating what by now is almost hornbook law about the proper method by which permanent injunctions may be enforced against noncompliant parties:

> [Injunctions] are enforced through the trial court's civil contempt power.  If the plaintiff (the party obtaining the writ) believes that the defendant (the enjoined party) is failing to comply with the decree's mandate, the plaintiff moves the court to issue an order to show cause why the defendant should not be adjudged in civil contempt and sanctioned.  The plaintiff's motion cites the injunctive provision at issue and alleges that the defendant has refused to obey its mandate.  If satisfied that the plaintiff's motion states a case of non-compliance, the court orders the defendant to show cause why he should not be held in contempt and schedules a hearing for that purpose.  At the hearing, if the plaintiff proves what he has alleged in his motion for an order to show cause, the court hears from the defendant.  At the end of

8

the day, the court determines whether the defendant has complied with the injunctive provision at issue and, if not, the sanction(s) necessary to ensure compliance.

Reynolds v. Roberts, 207 F.3d 1288, 1298 (11th Cir. 2000) (citations and footnote omitted); see Faught v. Am. Home Shield Corp., 660 F.3d 1289, 1293 (11th Cir. 2011) (per curiam) ("If the prosecution of the Edlesons' class action in California would interfere with the settlement approved by the district court, then American Home Shield should have moved the district court for an order to show cause why the Edlesons should not be held in contempt for violating the injunction against the prosecution of released claims.  American Home Shield should not have moved the district court to enter another injunction, and the district court should not have entered a second injunction to enforce its judgment."  (citation omitted)).

Under § 1291, the district court's postjudgment Enforcement Order is not final because it did not involve contempt or sanctions.  "A final order is one that 'ends the litigation on the merits and leaves nothing for the court to do but execute its judgment.'"  Crawford & Co. v. Apfel, 235 F.3d 1298, 1302 (11th Cir. 2000) (quoting Huie v. Bowen, 788 F.2d 698, 701 (11th Cir. 1986)).  Though postjudgment decisions necessarily follow a final judgment, such orders "are themselves subject to the test of finality."  Thomas II, 594 F.3d at 829 (quoting Delaney's Inc. v. Ill. Union Ins. Co., 894 F.2d 1300, 1304 (11th Cir. 1990)).

9

An order concerning the <u>enforcement</u> of a permanent injunction is not final unless it holds a party in contempt of court or imposes a sanction for violating the injunction.  <u>Id.</u> at 830.  In <u>Thomas II</u>, we dismissed an appeal similar to Bersin's for want of jurisdiction.  Our language could not have been clearer:

> Although the order did not direct the parties to take any further action, our decisions clearly instruct that permanent injunctions are enforced through the civil contempt power of the court.  <u>E.g.</u>, <u>Roberts</u>, 207 F.3d at 1298.  Allowing the district court an opportunity to enforce the permanent injunction through the usual means of contempt proceedings does not preclude appellate review; it <u>postpones</u> our review until the district court has finally settled the matter in litigation.  If we were to exercise our appellate jurisdiction at this early stage, before the district court has had an opportunity to enforce the permanent injunction, "the effect would be to tie the hands of the district court . . . and augment our own workload."  <u>Combs</u>, 785 F.2d at 977.

<u>Id.</u> (emphasis added); <u>see</u> <u>Thomas v. Blue Cross & Blue Shield Ass'n (Thomas I)</u>, 594 F.3d 814, 819 (11th Cir. 2010) ("Although the order ruled that Kolbusz is enjoined from prosecuting his claim of breach of contract, the order did not completely dispose of the issue. . . . Because the order 'did not hold [Kolbusz] in contempt or impose any sanction' for prosecuting a released claim in violation of the injunction, it is not appealable as a final order." (quoting <u>Major v. Orthopedic Equip. Co.</u>, 561 F.2d 1112, 1115 (4th Cir. 1977))); <u>Major</u>, 561 F.2d at 1115 ("The order did no more than find Major had violated the prior injunction and the contract.  Although it did not direct anything further to be done, it clearly anticipated that in order to dispose of the matter, OEC would take some further

10

action before the court either to have Major held in contempt, or to avoid the injunction, or other action, any or all of them.  It is therefore not a final order." (emphasis added)).[3]  The Enforcement Order did not settle the matter in this case because it did not rule as to contempt or sanctions.  Quite simply, we lack § 1291 jurisdiction.  The order was not final.[4]

Similarly, we lack § 1292(a)(1) jurisdiction.  That section permits interlocutory review of orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  28 U.S.C. § 1292(a)(1).  We have explained that "§ 1292(a)(1) must be construed narrowly so as to limit the availability of interlocutory appeals in cases involving injunctions."  Birmingham Fire Fighters, 280 F.3d at 1293; see Switz. Cheese

---

[3] In another case with a similar procedural stance, we reached the merits instead of dismissing for lack of appellate jurisdiction.  See Faught, 660 F.3d at 1292-93.  "Under the prior precedent rule, we are bound to follow a prior binding precedent 'unless and until it is overruled by this court en banc or by the Supreme Court.'"  United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008) (per curiam) (quoting United States v. Brown, 342 F.3d 1245, 1246 (11th Cir. 2003)).  The jurisdictional holding in Faught is neither binding nor the earliest precedent.  First, "we are not bound by a prior decision's sub silentio treatment of a jurisdictional question."  Okongwu v. Reno, 229 F.3d 1327, 1330 (11th Cir. 2000); accord King v. Cessna Aircraft Co., 505 F.3d 1160, 1168 (11th Cir. 2007) ("[T]he prior precedent rule does not extend to implicit jurisdictional holdings.").  The parties in Faught did not bring the jurisdictional issue to this Court's attention, and the opinion did not address the basis for appellate jurisdiction.  In addition, Thomas II is the controlling prior precedent because it came down in 2010, before Faught in 2011.  We follow Thomas II and dismiss for lack of appellate jurisdiction.  See 594 F.3d at 832.

[4] Our dissenting colleague says that the district court entered a § 1291 final order because the court granted all the relief sought in OBWB's motion.  But our precedent is crystal clear that, because permanent injunctions must be enforced through contempt proceedings, the district court order "did not dispose of the matter" and therefore "lacks the finality required for us to exercise jurisdiction under section 1291."  Id. at 829-30.  The dissent does not mention these binding principles, nor reconcile them with its conclusion.

11

Ass'n v. E. Horne's Mkt., Inc., 385 U.S. 23, 24 (1966) ("[W]e approach this statute somewhat gingerly lest a floodgate be opened that brings into the exception many pretrial orders."); United States v. City of Hialeah, 140 F.3d 968, 973 (11th Cir. 1998) ("Congress did not intend for the injunction exception to open the floodgates to piecemeal appeals.").

We may review an order that modifies a previously entered injunction, but (and the caveat is critical here) an order clarifying or interpreting an existing injunction is not appealable. See Thomas II, 594 F.3d at 832. "A modification inquiry under section 1292(a)(1) has two facets: a reviewing court must examine whether there was an underlying decree of an injunctive character, and if so, whether the ruling appealed from can fairly be said to have changed the underlying decree in a jurisdictionally significant way." Sierra Club v. Marsh, 907 F.2d 210, 212 (1st Cir. 1990). The first prong is met here because the Final Consent Judgment contained an injunction against "any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising" with regard to certain past or existing OBWB products or advertising.[5]

---

[5] The district court stated that such litigation "is barred." Though the court did not specifically label its proscription as an injunction, the functional effect of the order controls. See Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc., 14 F.3d 1507, 1515 n.14 (11th Cir. 1994) ("[T]his court is not bound to accept a district court's characterization of its own rulings."); Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 358 (Fed. Cir. 1992) ("The trial court's amended judgment does not expressly characterize the relief as injunctive, but its characterization is not controlling. The true nature of the trial court's order is what matters . . . ."). An injunction "require[s] a party either to do or to refrain from doing some act." 11A

Our analysis then necessarily turns on whether the Enforcement Order amounted to a "modification" or a "clarification" of the previous injunction.

In distinguishing between modifications and clarifications, our case law instructs us to apply a "functional approach, looking not to the form of the district court's order but to its actual effect." Birmingham Fire Fighters, 280 F.3d at 1293 (quoting Marsh, 907 F.2d at 213). Thus an order modifies, rather than clarifies, an existing injunction "when it actually changes the legal relationship of the parties." Id.; see Marsh, 907 F.2d at 213 ("Because the district court did not change the nature or scope of the judicially imposed prohibition, the court did not 'modify' the injunction within the meaning of section 1292(a)(1)."). Notably, "[a]n order that interprets an injunction changes the legal relationship of the parties only when it blatantly misinterprets the injunction." Thomas II, 594 F.3d at 832. That is because our precedent forbids us from "analyz[ing] the injunction and the order in

Charles Alan Wright et al., Federal Practice and Procedure § 2941 (2d ed. 2013); see Black's Law Dictionary 855 (9th ed. 2009) (defining an "injunction" as a "court order commanding or preventing an action"). Here, the Final Consent Judgment contained an injunction because it unambiguously stated: "[t]he Court hereby ORDERS and ADJUDGES that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any past or existing product, advertising regarding patented process, water treatment system, technology, water, ice cubes, or 'Cubsta machine', covered by this Stipulation of Dismissal, that has been marked, manufactured, sold, distributed, advertised or promoted by OBWB prior to entry of this Final Judgment, is barred."

We think that the dissent has misapprehended the Final Consent Judgment. The dissent states that "the Final Consent Judgment does not order . . . anyone . . . to do or not do anything in particular." But, as we've explained, the Final Consent Judgment plainly "ORDER[ED] and ADJUDGE[D]" that certain types of litigation were "barred." The dissent also says that the only signatories to the settlement agreement were the parties, but the district court judge signed the Final Consent Judgment.

13

detail.  To plunge into the details would collapse the jurisdictional inquiry into a decision on the merits, thwarting the purpose of § 1292(a)(1) . . . [and] letting piecemeal appeals, cloaked in the guise of jurisdictional inquiries, come in through the back door."  Birmingham Fire Fighters, 280 F.3d at 1293.  As a result, "our inquiry is circumscribed. We ask not whether the district court's reading of the consent decree is in error, but whether it is a gross misinterpretation of the decree's original command."  Id. (emphasis added).

In this Circuit, then, we have refused to recognize an appealable modification unless the second order works an obvious change in the rights of the parties.  Thomas II involved a class action brought by physicians who alleged that an insurer had "improperly delayed, denied, and reduced payments."  594 F.3d at 832.  When the parties settled, the district court entered a judgment enjoining suit by class members.  Id. at 827.  A doctor later sued in state court, alleging that the insurer had "retaliated against him for complaining about the plans' improper reimbursement practices."  Id.  at 832.  That doctor then sought an order from the district court declaring that his claims did not fall within the injunction.  Id. at 827. When the district court denied the doctor's motion, this Court refused to hear the appeal, finding no blatant misinterpretation and thus no modification.  Id. at 832. Likewise in Birmingham Fire Fighters, a panel of this Court determined that two readings of a previous consent decree were plausible.  Because the district court's

14

interpretation in the second order was "certainly not so implausible as to amount to a blatant misinterpretation," it was not an appealable modification.  280 F.3d at 1294.

Other circuit courts have reached similar results, stressing that they will not seek "to uncover subtle rather than blatant misrepresentations," because to do so would be "too searching for a preliminary jurisdictional inquiry."  Gautreaux v. Chi. Hous. Auth., 178 F.3d 951, 958 (7th Cir. 1999); see, e.g., United States v. Philip Morris USA Inc., 686 F.3d 839, 845 (D.C. Cir. 2012) ("The district court's interpretation of the data-disclosure requirement does not change the terms or force of [the original injunction], and it is certainly not 'obviously wrong.'"); Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 477 F.3d 1151, 1155 (10th Cir. 2007) ("[T]he District Court did not change the legal relationship between the parties or impose new obligations on Danette, but instead clarified that under the existing 1989 injunction and Rule 65, she is prohibited from aiding Hector in violating the 1989 injunction.").  On the other hand, courts have recognized modifications when new orders clearly changed the reach of an existing injunction.  See, e.g., R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 286 F.3d 194, 201 (4th Cir. 2002) (finding a modification when orders "extended the scope of the earlier injunctions to cover new circumstances" because "the court had earlier only prohibited the sale of individual artifacts but had never enjoined the sale of the artifacts as a

15

collection"); United States v. Bd. of Sch. Comm'rs of City of Indianapolis, 128 F.3d 507, 509 (7th Cir. 1997) ("There is no question that in adding compulsory [rather than optional] busing of kindergarten students to the original injunction, the district judge modified that injunction . . . .").[6]

Turning to our circumscribed inquiry, we conclude that the district court's Enforcement Order is an interpretation not appealable under § 1292(a)(1). Simply put, the Enforcement Order amounted to a clarification because we cannot say that it patently misinterpreted the language of the original injunction. Initially, the Final Consent Judgment ordered that "any future litigation alleging violations of . . . any . . . statute or law related to false marking or advertising" tied to certain OBWB activities described therein "is barred." (emphasis added). Like in Thomas II, this original injunction was "extremely broad." 594 F.3d at 832. On round two, the district court adopted a reasonable interpretation of this expansive prohibition in concluding that Bersin's state court causes of action were barred because they were based on OBWB's marketing and advertising of a patented

---

[6] The dissent applies a more searching standard of review to this jurisdictional question, asking whether the district court's second order in any way altered the scope of the restriction on suits in the Final Consent Judgment. But, as our precedent explains, we can only conclude that a subsequent order modifies an injunction for purposes of § 1292(a)(1) if the district court's reading is so implausible as to be a blatant misinterpretation. See, e.g., Birmingham Fire Fighters, 280 F.3d 1289. The dissent places substantial emphasis on the fact that the settlement between Mamma Mia's and OBWB came as part of a qui tam action, while Bersin's suit does not involve qui tam claims. The dissent, however, does not explain how or why the qui tam nature of the original litigation would alter the necessarily limited standard of review we have applied in the preliminary jurisdictional analysis. Again, we ask only whether the Enforcement Order so obviously misinterpreted the Final Consent Judgment as to modify the original injunction.

16

water treatment process.  Each of the causes of action raised in Bersin's amended state court complaint rested in substantial measure on allegations that Fassberg made fraudulent advertising claims about OBWB's "patented 14 stage water treatment process" and "patented technology," and that "Fassberg's false and misleading information regarding Defendants' advertising and marketing claims . . . is and was integral to the success of the Alton Road BWB."  In other words, adjudicating each of Bersin's causes of action required the state court to determine whether OBWB had committed false marking and advertising concerning the same patented technology.  The district court thus did not blatantly misinterpret its own initial injunction when it determined that Bersin's causes of action were "related to false marking or false advertising."

Nor did the district court commit a glaring misinterpretation by determining that Bersin was a party enjoined by the initial order.  The paragraph of the Final Consent Judgment that barred "any future litigation" did not specify who was the object of this ban.  Elsewhere in the order, though, the court noted that Mamma Mia's had "standing to act on behalf of the United States of America and the general public."  It was not a blatant misinterpretation for the district court to conclude that the Final Consent Judgment enjoined Bersin -- as a member of the general public -- from certain future litigation.  In addition, although we apply a functional approach, we find it instructive that the district court explained its own

17

Enforcement Order as a <u>direct</u> application of the existing injunction, not an alteration of its sweep.  By concluding that the "Final Consent Judgment . . . specifically bar[s] Bersin's causes of action," the Enforcement Order did not change the legal relationship of the parties because it did not alter the nature of the existing equitable relief.   See id. at 832 ("The order that denied Robertson's motion, at most, clarified that Robertson's complaint in a Florida court was released, but the order did not modify the permanent injunction.").[7]

In the absence of appellate jurisdiction, we cannot consider merits questions.  Nor can we tunnel a backdoor to the merits by straining the modification / clarification analysis, lest we undermine the gatekeeping function (and statutory command) of §§ 1291 and 1292.[8]  Without jurisdiction to entertain this matter, we

---

[7] The dissent points out that the Final Consent Judgment was part of a settlement between Mamma Mia's and OBWB.  The district court wrote the original injunction broadly, to encompass more than claims brought by Mamma Mia's.  Other paragraphs in the Final Consent Judgment specifically name Mamma Mia's or OBWB as the parties subject to the Court's order.  Paragraph 3, however, orders a general bar on litigation, without limiting the scope to Mamma Mia's or OBWB.  Whether or not the dissent would read the scope of the Final Consent Judgment differently, we cannot say that the district court's interpretation of its own order "is blatantly or obviously wrong."  Id. at 1293.

[8] Though the dissent says it rests its jurisdictional finding on a change in the scope of the original injunction, as we see it its analysis is a backdoor review of the injunction itself.  In effect, the dissent reasons that an injunction covering nonparties, or an injunction barring state actions beyond those arising under the False Claims Act, would have been invalid, and therefore the district court must not have issued it in the first place in the Final Consent Judgment.  But, in the context of examining our appellate jurisdiction, our task is not to say whether the original injunction was valid; the question of its enforceability is not before us.  Instead, we ask only whether the district court's reading of the Final Consent Judgment in its subsequent order was "so implausible as to amount to a blatant misinterpretation."  Id. at 1294.  The dissent does not dispute that the broad language of the Final Consent Judgment could fairly be read as enjoining Bersin from bringing actions against OBWB related to certain false marking or false advertising.

18

pass no judgment on whether the district court acted within its broad equitable authority in issuing so sweeping an injunction.  We say nothing about the enforceability or indeed about the advisability of the injunction entered by the district court.  See Birmingham Fire Fighters, 280 F.3d at 1294 ("The district court's interpretation might be reversed if the issue were before us on appeal from a final judgment, but it is not.  What we hold, and all that we hold, is that the district court's interpretation of the key language does not so blatantly misinterpret the decree as to 'modify' it and thereby create interlocutory appellate jurisdiction under § 1292(a)(1).").

We recognize that the peculiar nature of the underlying qui tam action, with Mamma Mia's (on behalf of the United States) representing the future litigation interests of Bersin, prevented Bersin from having a traditional opportunity to challenge the original injunction as a party to the suit.  Nevertheless, Congress established the false marking qui tam action that permitted Mamma Mia's representative suit.  Congress also "intended appeals from interlocutory orders to

It simply proposes to read the order in another way.  But because the district court's reading was a plausible interpretation, not a modification, we lack § 1292(a)(1) jurisdiction.  The dissent may be right in its concern about the scope of the injunction.  But in this peculiar procedural circumstance -- where the district court has not enforced its injunction through contempt proceedings, and where the original injunction is not on appeal -- we cannot consider whether that court properly enjoined Bersin or its state court actions.

The dissent cites cases that took § 1292(a)(1) jurisdiction to review injunctions entered under the All Writs Act, 28 U.S.C. § 1651.  As we see it, these cases are inapposite, however, because none involve an order that interpreted a previously entered injunction.  We reiterate that the Enforcement Order interpreted an existing injunction; it did not modify an injunction or grant a new one.

be strictly limited to the unusual situations wherein such appeals are expressly authorized." St. Louis Shipbuilding & Steel Co. v. Petroleum Barge Co., 249 F.2d 905, 907 (8th Cir. 1957).  Moreover, adjudicating the merits of Bersin's challenge would provide it with no relief.  Notably, Bersin does not ask us to overturn the imposition of contempt or sanctions.  And even if we found fault with the Enforcement Order, our ruling would not disturb the unappealed underlying injunction.  Because Bersin does not challenge a final decision or an interlocutory order that has "a final and irreparable effect on the rights of parties," we have no power to hear this case.  Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949); see id. ("Appeal gives the upper court a power of review, not one of intervention.  So long as the matter remains open, unfinished or inconclusive, there may be no intrusion by appeal.").

We underscore, however, that nothing prevents this Court from hearing a future appeal from an order in this case that imposes sanctions or holds Bersin in contempt.  We hold only that at this stage in the proceedings this matter is not fit for our appellate review.

**DISMISSED** for lack of appellate jurisdiction.

20

EVANS, Judge, dissenting:

I respectfully dissent from the majority's determination that we have no jurisdiction to hear this appeal.  We have jurisdiction under 28 U.S.C. § 1291 because the district court's postjudgment Enforcement Order against Bersin is a final order.  It granted all of the relief sought by OBWB's motion to enforce the judgment against Bersin.  OBWB sought, and obtained, an injunction to stop Bersin from continuing to pursue certain state law claims in a pending state court lawsuit.  OBWB sought no other relief.  This gives us jurisdiction to hear Bersin's appeal.  Thomas v. Blue Cross & Blue Shield Ass'n (Thomas II), 594 F.3d 814, 819 (11th Cir. 2010) ("In post judgment proceedings, a post judgment order is final for purposes of section 1291 if it 'finally settles the matter in litigation' by disposing of all issues raised in the motion." (citation omitted)).

We also have jurisdiction under 28 U.S.C. § 1292(a)(1) to hear Bersin's appeal because the district court's Enforcement Order significantly changed the scope of the alleged injunction in the Final Consent Judgment issued by the district court.  Bersin was not a party in this case in 2011 when the Final Consent Judgment was entered.  The Final Consent Judgment did not mention Bersin and Bersin has never been represented by a party[1] in this case.  Mamma Mia's as

---

[1] This is importantly different from the Thomas cases, which involved class members bound by an injunction which precluded further litigation of certain claims after a class-wide settlement. Bersin was not bound by the Final Consent Judgment.

21

relator did not represent Bersin.  The majority's statement to the contrary -- that Mamma Mia's represented Bersin "as a member of the public" -- is simply incorrect, as discussed below.  Thus, the Final Consent Judgment binds only Mamma Mia's and OBWB.  The injunction in the Enforcement Order is specifically aimed at Bersin, a substantive difference.  Also, changing the initial (alleged) injunction order to prohibit not just another qui tam suit but also to prohibit Bersin's in personam suit for damages against OBWB significantly broadened the scope of the (alleged) injunction which addressed only repetitive qui tam litigation.

Further, I do not agree that the Final Consent Judgment contained an injunction against anyone, either in form or in function.  It was an agreed upon consent judgment between Mamma Mia's and OBWB only based on their privately negotiated, confidential settlement agreement.  It did say ". . . any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising[2] . . . is barred."[3]  Because the only signatories to the settlement agreement were Mamma Mia's and OBWB, this is a simple statement that Mamma Mia's and OBWB agree that repetitive qui tam litigation

---

[2] I interpret "false advertising" here to mean advertising which falsely represents the patent status of a product.

[3] This is the entirety of the so-called "bar order" in the Final Consent Judgment.

22

between themselves would be barred.[4]  Also, the Final Consent Judgment does not

order Mamma Mia's or OBWB or anyone else to do or not do anything in

particular, a classic requirement of an injunction.  Black's Law Dictionary 904

(10th ed. 2014) (defining an injunction as "[a] court order commanding or

preventing an action").

The majority errs in failing to recognize that Bersin's state court suit is not a

qui tam action.  It errs in failing to recognize Bersin's status as a litigant with

interests separate from the interests of Mamma Mia's and OBWB.  This impacts

both the issue of our jurisdiction and the merits of the appeal.  Mamma Mia's in its

capacity as relator had no right and no ability to release Bersin's third party

damages claim against defendant OBWB.  Unlike the qui tam claim, the United

States did not own Bersin's state court damages claim and therefore could not

assign it.  Therefore, Mamma Mia's as relator representing the United States could

not release it.  No privity exists between OBWB and Bersin or Mamma Mia's and

Bersin, thus, neither of them in their private capacities had the authority to release

Bersin's state court damages claim against OBWB.  The majority is mistaken in

reasoning that Bersin could be enjoined from continuing its state court suit against

OBWB or deprived of its right to appeal because Bersin is "a member of the

---

[4] The settlement agreement's reference to "any other statute or law relating to false marking or false advertising" is a probable reference to future versions of the Patent False Marking statute, including the current version of § 292 which succeeded former § 292 in September 2011.  It seems doubtful that any state statute or law would address misuse of the federal patent system.

23

public."  Mamma Mia's as relator was tasked to represent the interests of the United States and the public in stopping false patent claims.  Mamma Mia's did not represent Bersin in negotiating the settlement agreement.

Even if we were to assume that the Enforcement Order against Bersin is interlocutory instead of final, we would have jurisdiction to hear this appeal.  The district court relied on the All Writs Act, 28 U.S.C. § 1651, to justify enjoining the state court causes of action, where it had no jurisdiction to do so under the Anti-Injunction Act, 28 U.S.C. § 2283.  We have jurisdiction to hear an appeal complaining of the entry of such an injunction.  See Estate of Brennan v. Church of Scientology Flag Serv. Org., Inc., 645 F.3d 1267 (11th Cir. 2011); Bayshore Ford Trucks Sales, Inc. v. Ford Motor Co., 471 F.3d 1233 (11th Cir. 2006); Burr & Forman v. Blair, 470 F.3d 1019, 1023 (11th Cir. 2006); Klay v. United Healthgroup, Inc., 376 F.3d 1092 (11th Cir. 2004);  Peterson v. BMI Refractories, 124 F.3d 1386, 1390 (11th Cir. 1997); see also In re BankAmerica Corp. Secs. Litig., 263 F.3d 795, 800 (8th Cir. 2001).

FORMER § 292

Before turning to discussion of the merits of the appeal, it is helpful to note the particular nature of former 35 U.S.C. § 292, under which this suit was brought.

24

This version of the Patent False Marking statute was a qui tam[5] statute designed to elicit the assistance of relators who would bring suit against those who falsely marked or falsely advertised the patent status of goods. The statute imposed a fine or penalty[6] of up to $500 per offense; successful relators could keep fifty percent of the penalty imposed, but had to remit the other fifty percent to the United States. While the statute recognized no right of intervention by the United States, intervention was permissible under Rule 24, Federal Rules of Civil Procedure. Stauffer v. Brooks Bros., 619 F.3d 1321, 1328-29 (Fed. Cir. 2010); S.F. Tech., Inc. v. Graphic Packaging Int'l, Inc., 798 F. Supp. 2d 1333, 1337 (N.D. Ga. 2011) (Pannell, J.) (Rule 24 requires a court to allow the United States to intervene in actions filed by qui tam relators under former 35 U.S.C. § 292). While the statute did not require the United States' agreement to a settlement, it apparently was a common practice for relators to seek approval.

Former § 292 did not require that the relator have any economic or other injury caused by defendant's false marking or false advertising or even that there be a pre-existing relationship between the relator and the defendant. The relator's only role was to represent the government in finding, suing and penalizing those

---

[5] A qui tam action is "[a]n action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specific public institution will receive." Black's Law Dictionary 1444 (10th ed. 2014).

[6] Former § 292(a) says "fine"; § 292(b) says "penalty."

who abuse the patent system, thereby helping to preserve the integrity of the system. Rogers v. Tristar Prods., Inc., 793 F. Supp. 2d 711, 723 (E. D. Penn. 2011) ("[A] key purpose of the 1952 amendment was to transform the statute into an ordinary criminal statute with a private enforcement mechanism."); Forest Grp., Inc. v. Bon Tool Co., 590 F.3d 1295, 1302-04 (Fed. Cir. 2009). The only courts which have directly addressed the issue have held that a second qui tam case may not be brought against a defendant already found liable for the fine or penalty for the same patent-related misrepresentations. See Simonian v. Irwin Indus. Tool Co., No. 10-1260, 2011 WL 147717 (N.D. Ill. Jan. 18, 2011); S.F. Tech., Inc. v. Graphic Packaging Int'l, Inc., 798 F. Supp. 2d 1333 (N.D. Ga. June 16, 2011); Eaglewood Consulting, LLC v. Graphic Packaging Int'l, Inc., No. 1:10-CV-03467-RWS, 2011 WL 2489944 (N.D. Ga. June 20, 2011) (Story, J.). The theory of these holdings is not res judicata, but rather that a qui tam claim rests on an implicit statutory assignment of the United States' right to assert its patent abuse claim. This implicit assignment works only one time; conclusion of the first suit means there can be no further assignment of the United States' claim. See S.F. Tech., 798 F. Supp. 2d at 1336; Eaglewood Consulting, 2011 WL 2489944, at *3 ("the United States has already settled and released all claims against GPI arising under Section 292"). See also Stauffer v. Brooks Bros., Inc., 619 F.3d 1321 (Fed. Cir. 2010) (recognizing that the United States' sovereign interest in preventing patent abuse

26

gives rise to a cause of action which is implicitly assigned to the relator by the qui tam provision of former § 292(b)). Where repetitive qui tam claims are involved -- it makes sense that the second suit cannot be brought.

THE MERITS OF THE APPEAL

We should reverse and vacate the district court's Enforcement Order against Bersin for three reasons. First, the Anti-Injunction Act, 28 U.S.C. § 2283, precludes the district court's jurisdiction over Bersin's state court damages suit against BWB and Fassberg. No independent federal jurisdiction exists as to the state law damages claims in the state court suit. Also, the state court damages suit is not a qui tam action and does not involve the same parties as this qui tam suit. Resolution of the qui tam action had no res judicata effect as to the state court action. Second, the district court's Enforcement Order purports to state, but significantly misstates, the bar language of the Final Consent Judgment, broadening it to include "litigation that either alleges violations of 35 U.S.C. § 292 OR any claims related to false marking or false advertising." (emphasis added). This is a very important distinction, because the state court litigation does not involve claims under 35 U.S.C. § 292 or claims under "any statute or law related to false marking or false advertising,"[7] but it arguably involves state law claims

---

[7] The state law claims brought by Bersin against OBWB are for: (1) fraud in the inducement, (2) negligent misrepresentation and omissions and (3) violations of FDUTPA. The Enforcement

27

"related to false marking or false advertising" because false patent claims and false advertising are one type of misrepresentation OBWB and Fassberg allegedly made to Bersin. Third, the Releases executed by Mamma Mia's and OBWB did not purport to release Bersin's claims against OBWB. They did not mention either Bersin or its claims against OBWB, either directly or indirectly. They only released the mutual claims of Mamma Mia and OBWB against each other. Neither did Mamma Mia's Release state that it was being executed by Mamma Mia's in its capacity as representative of the United States.[8] In any event, Mamma Mia's had no ability to release Bersin's state court damages claims because those claims were not assigned to Mamma Mia's as relator. Also, no privity exists between Mamma Mia's and Bersin or OBWB and Bersin. Neither Mamma Mia's nor OBWB had the right to release Bersin's claims for damages against OBWB. Bersin was not consulted about the terms of the settlement agreement. The mutual Releases were a private exchange between Mamma Mia's and OBWB and did not bind Bersin.

FACTUAL BACKGROUND

---

Order first enjoins all three claims "to the extent they allege false marking or false advertising claims" but then in the conclusion section states: "The causes of action . . . that relate to patent and product advertising, including all the materials and statements made prior to March 28, 2011 are ENJOINED. This injunction includes each of the three counts in the Bersin Bagels Litigation." Thus, the injunction language is internally inconsistent and could cause confusion in the state court proceeding.

[8] It is easy to see why the United States would not want Mamma Mia's to grant a blanket exemption from any claims which the United States might have against OBWB.

28

The factual summary in the majority opinion is expanded as follows.

In August 2010 OBWB threatened to sue a large number of defendants, including Mamma Mia's, in state court over their use of some sort of "water system" which allegedly produced water tasting like water in Brooklyn, New York. OBWB prepared a complaint seeking damages and sent it to Mamma Mia's and other named defendants[9] with a demand letter. OBWB alleged that the water system/water was a proprietary trade secret which Mamma Mia's had acquired from individuals who had stolen the trade secret from OBWB. The complaint was filed in a state court in Palm Beach County.

In September 2010 Mamma Mia's responded by filing the instant qui tam action against OBWB seeking an award of the fine/penalty available under former § 292 for OBWB's false claims of patent protection for the water system/water. The United States did not seek to intervene.

On March 16, 2011 Mamma Mia's and OBWB signed a privately negotiated Confidential Settlement Agreement ("settlement agreement") to settle the instant qui tam action and OBWB's claims against Mamma Mia's in the state court case in Palm Beach County. The settlement agreement called for a mutual dismissal of claims and a payment of $5,000 by OBWB to Mamma Mia's and $5,000 to the

---

[9] The other defendants were Famous New York Baking Water Corp., Donald S. Kurtzer, Angela Bean, Quality Water Installations, Inc., Luis Figueroa, Bates Private Retail, Inc., Bruce Bates, Fitness and Health by CLA, Inc., and Christian Lezmez.

29

U.S. government.  Nothing in the record suggests that Bersin knew about the settlement discussions.  Bersin was not involved in the Palm Beach case.  The settlement agreement did not mention Bersin either directly or indirectly.  It did state that Mamma Mia's agreed "to cooperate with BWB[10] to obtain a bar order relating to potential future claims and ligation under 35 U.S.C. § 292 . . . .", meaning a bar of another qui tam action.

Mamma Mia's and OBWB also prepared an agreed-upon Final Consent Judgment and Dismissal with Prejudice.  On or about March 16, 2011, Mamma Mia's and OBWB sent the settlement agreement and proposed Final Consent Judgment to the Department of Justice.  These documents are in the record.  The motion filed by Mamma Mia's and OBWB with the district court states that the Justice Department "indicated it had no objection to the settlement agreement or the settlement documents," although there is no reply document from the Justice Department in the record.  Because none of the documents sent to the Justice Department mentioned Bersin either directly or indirectly, there is no basis for an inference that the Justice Department approved OBWB's later-announced plan to cut off any non-qui tam claims Bersin might have against OBWB.  Taking the

---

[10] The reference to BWB as opposed to OBWB is not an error.  BWB is a subsidiary of OBWB and was the franchisor of the various bagel locations.  Thus, BWB was a potential target of qui tam suits like the one Mamma Mia's brought against OBWB.

documents at face value, they pertain only to transactions between Mamma Mia's and OBWB , plus their respective affiliates.

On March 23, 2011 and March 18, 2011 Mamma Mia's and OBWB respectively signed General Releases in favor of the other, broadly releasing all claims, including those which were made or which could have been made in the Palm Beach litigation or in this qui tam case.

Mamma Mia's and OBWB filed their Joint Motion for Entry of Consent Final Judgment of Dismissal on March 24, 2011.  The Joint Motion attached a proposed Final Consent Judgment which the district court entered on March 28, 2011.  The Final Consent Judgment contained this language:

> The Court hereby Orders and Adjudges that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any water treatment system . . . water . . . that has been marked, advertised or promoted by OBWB prior to entry of this Final Judgment, is barred.

(emphasis added).

Because it is difficult to envision other statutes or laws "related to false marking or false advertising" of patented  products except for qui tam statutes, I interpret the foregoing to proscribe repetitive litigation under 35 U.S.C. § 292 or any other qui tam statute, perhaps the current version of § 292 which then was anticipated to take effect, and did take effect, in September of 2011.

31

The Final Consent Judgment also contained a statement that "[Mamma Mia's] has a valid statutory assignment of the rights of the United States of America to pursue and dispose of the claims resolved and dismissed in this Stipulation of Dismissal."

On February 24, 2012 Bersin filed a state court lawsuit in Miami-Dade County against BWB and its owner, Steven M. Fassberg. The Second Amended Complaint filed June 19, 2012 is the operative complaint here. The Second Amended Complaint recites events which occurred beginning in 2010 when Fassberg (alleged founder and chief executive of OBWB/BWB) and Bersin discussed a business deal for a new location on Alton Road in Miami, Florida. The discussions culminated in an Operating Agreement between BWB, franchisor, and BWB Associates, Inc, franchisee[11] on August 20, 2010. While the location apparently opened, it was unsuccessful. Bersin blames this on the failures of the BWB entities to live up to their commitments, causing Bersin to have to expend extra money to support the operation. Bersin also complains of a long list of misrepresentations allegedly made by Fassberg/BWB which induced Bersin to invest in the operation, including but by no means limited to representations concerning the patent status of the water system/water used at the Alton Road location.

---

[11] The members of BWB Associates, Inc. were Bersin and BWB-South Beach (a/k/a BWB-SB).

32

On March 18, 2013, OBWB filed a pleading in the instant qui tam action entitled Defendant's Second Motion to Enforce Final Consent Judgment of Dismissal with Prejudice. This pleading was actually OBWB's first pleading seeking to enforce the consent judgment against Bersin. The pleading labeled First Motion to Enforce was against Florida Bagels, an entirely separate company situated similarly to Bersin in relation to OBWB.[12] Bersin filed a brief in opposition. The district court entered an Order Granting Second Motion to Enforce Final Consent Judgment of Dismissal with Prejudice (Enforcement Order). The order relied upon the All Writs Act, 28 U.S.C. § 1651 and a portion of the Anti-Injunction Act, 28 U.S.C. § 2283, as a jurisdictional basis for its injunction. This order noted the broad release of Mamma Mia's claims against OBWB and the bar language previously noted. It relied upon Eaglewood Consulting, 2011 WL 2489944, which held that one qui tam suit bars a second qui tam suit against the same defendant. It concluded that: "This Court's Final Consent Judgment and the Release specifically bars Bersin's causes of action to the extent that they are based on false marking and advertising claims." Bersin, as "Non-Party Intervenor"[13] appealed.

_____

[12] Florida Bagels initially appealed the Enforcement Order entered against it but settled with OBWB before oral argument in this qui tam case took place.

[13] Regardless of how Bersin's role is labeled, it did submit itself to the jurisdiction of the district court when it filed its brief in opposition to OBWB's Motion to Enforce Judgment. Bersin does not argue otherwise.

Having found jurisdiction to decide this appeal, I would vacate the district court's Enforcement Order against Bersin because (1) the Anti-Injunction Act, 28 U.S.C. § 2283, precludes the district court's jurisdiction over Bersin's state court damages suit; (2) the district court's Enforcement Order misstates and thereby improperly broadens the language of the Final Consent Judgment; and (3) the Releases executed by Mamma Mia's and OBWB did not release Bersin's claims against OBWB.

First, the Anti-Injunction Act, 28 U.S.C. § 2283, precludes the district court's jurisdiction to enjoin Bersin's state court damages suit against BWB.  The Anti-Injunction Act serves as a check on the broad authority recognized by the All Writs Act, 28 U.S.C. § 1651, by expressly prohibiting a federal court from enjoining state court proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  The Anti-Injunction Act and All Writs Act are closely related; "[i]f one of the three specific exceptions contained in the Anti-Injunction Act permits an injunction, the All Writs Act grants a federal court the power to issue it."  Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta, 701 F.3d 669, 675 (11th Cir. 2012) (citation omitted).  "Thus, in assessing the propriety of an injunction entered to stop a state court proceeding, the sole relevant

inquiry is whether the injunction qualifies for one of the exceptions to the Anti-Injunction Act." Burr & Forman v. Blair, 470 F.3d 1019, 1028 (11th Cir. 2006).

The third exception to the Anti-Injunction Act, a federal court granting an injunction "to protect or effectuate its judgments," is at issue here. Generally referred to as the "relitigation exception," this exception "is appropriate where the state law claims would be precluded by the doctrine of res judicata." Id. at 1029-30 (internal quotation marks and citations omitted). A party seeking an injunction of a state court proceeding under this exception must make a strong and unequivocal showing of relitigation. Delta Air Lines v. McCoy Rests., 708 F.2d 582, 586 (11th Cir. 1983).

"Federal courts apply the law of the state in which they sit with respect to the doctrine of res judicata." NAACP v. Hunt, 891 F.2d 1555, 1560 (11th Cir. 1990) (citation omitted). "Under Florida law, res judicata applies where there is: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; (4) identity of the quality [or capacity] of the persons for or against whom the claim is made; and (5) the original claim was disposed on the merits." Lozman v. City of Riviera Beach, 713 F.3d 1066, 1075 (11th Cir. 2013) (internal quotation marks and citations omitted). As to the third element, "[r]es judicata applies only when the parties to the action, or their privies, are identical in the prior and subsequent action." Id. at 1075 n.7.

35

Here, the second, third and fifth elements required for res judicata to apply are not met.  The causes of action are not the same.  The first action (the instant case) is a qui tam suit brought by Mamma Mia's on behalf of the United States pursuant to 35 U.S.C. § 292.  The subsequent action, however, is not a qui tam action but a private cause of action brought by Bersin under Florida common law and statutory law.[14]  Further, Bersin is not seeking to litigate the false marking and false advertising claims that were the subject of the qui tam suit.  Rather, Bersin brings independent state law tort and Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") claims that are only in part related to the false patent marks and advertisements.

Further, the parties to the prior and subsequent actions are not identical.  This qui tam action involves Mamma Mia's as relator and OBWB as defendant.  Neither of them is involved in the subsequent litigation between Bersin and BWB.  Bersin was not involved in this qui tam action and is not in privity with any party that was.  Therefore, res judicata is inapplicable here.

Because res judicata does not preclude Bersin's claims, the Bersin case does not fall within the specific relitigation exception of the Anti-Injunction Act.

---

[14] The district court's reliance on Eaglewood Consulting, 2011 WL 2489944, to bar Bersin's claims is misplaced.  In Eaglewood, the court held that one qui tam suit bars a second qui tam suit against the same defendant.  Id.  As the Bersin state court suit is not a qui tam action, Eaglewood does not apply.

36

Therefore, the district court lacked jurisdiction under the Anti-Injunction Act to enjoin the state court proceedings.

Even assuming *arguendo* that the district court did have jurisdiction to enjoin the state court proceedings, I would vacate and reverse the Enforcement Order because Bersin's Miami-Dade County state court claims against OBWB are not barred by the plain language of the Final Consent Judgment. The Enforcement Order purports to state, but actually misstates and broadens the language of the Final Consent Judgment to cover Bersin's claims.

The Final Consent Judgment says:

> The Court hereby Orders and Adjudges that any future litigation alleging violations of 35 U.S.C. § 292 or any other statute or law related to false marking or false advertising, with regard to any past or existing product, advertising regarding patent process, water treatment system, technology, water, ice cubes or "Cubsta Machine," covered by this Stipulation of Dismissal, that has been marked, manufactured sold, distributed advertised or promoted by OBWB prior to entry of this Final Judgment, is barred.

(emphasis added). The district court's Enforcement Order, however, mistakenly says that the Final Consent Judgment "expressly states that any future litigation related to false marking or false advertising with regard to the OBWB's past or existing product, advertising regarding patented process, water treatment system, technology, water, ice cubes or 'Cubsta machine' is covered by the Final Consent Judgment and is barred." (emphasis added).

37

This interpretation of the Final Consent Judgment as barring all litigation related to false marking or false advertising considerably broadens the actual language of the Final Consent Judgment, which barred only litigation alleging violations of any <u>statute or law</u> related to false marking or false advertising. While Bersin's claims for inducement,[15] negligent misrepresentation,[16] and FDUTPA violations[17] are partially based on Fassberg's representations regarding the allegedly patented water treatment process, Bersin does not allege violations of 35 U.S.C. § 292 or of any state law or statute related to false advertising or false marking in its state court case. In fact the applicable laws and statute under which Bersin is suing make no reference to false marking or advertising. Further, Bersin's claims are also based upon BWB's and Fassberg's misrepresentations

---

[15] "The elements of an action for fraud in the inducement under Florida law are (1) misrepresentation of a material fact, (2) by someone who knew or should have known of the statement's falsity, (3) with intent that the representation would induce another to rely and act on it, and (4) injury suffered in justifiable reliance on the representation." Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co., 336 F. Supp. 2d 1239, 1284 (S.D. Fla. 2004).

[16] The elements of a negligent misrepresentation claim under Florida law are "(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury resulted to the plaintiff in justifiable reliance upon the misrepresentation." Visonic Sys. v. AT&T Digital Life, 971 F. Supp. 2d 1178, 1196 (S.D. Fla. 2013).

[17] Bersin asserts violations of the FDUTPA under Fla. Stat. §§ 501.203(3)(a) , 501.204. Fla. Stat. § 501.203(3)(a) defines a violation as one which violates "any rules promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 41 et seq." Fla. Stat. § 501.204 states that " [u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

38

regarding the provision and management of daily business operations. These claims have no relation whatsoever to false marking or false advertising. Therefore, Bersin's state court claims are not barred by the Final Consent Judgment.

Additionally, Bersin's state court claims are not barred by the Releases executed by Mamma Mia's and OBWB, because they did not purport to release Bersin's claims against BWB. The releases make no mention either of Bersin or its claims against OBWB. Rather, they only released the mutual claims of Mamma Mia and OBWB against each other. The Releases also do not state that Mamma Mia's was acting in its capacity as representative of the United States in executing its Release.

Finally, Mamma Mia's as relator had no authority to "release" Bersin's right to pursue its state court damages claim against OBWB because the United States did not own this claim, and it could not have been the subject of a statutory assignment to the relator. The district court's Enforcement Order to the contrary is error as a matter of law.

In sum, I respectfully dissent from the majority's determination that we have no jurisdiction to hear this appeal, and having found jurisdiction, would reverse and vacate the district court's Enforcement Order against Bersin.

39